**PHILADELPHIA MARINE TRADE ASSOCIATION, Appellant,**

v.

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION and Local 1291, International Longshoremen's Association.**

**No. 16583.**

United States Court of Appeals Third Circuit.

Argued Oct. 31, 1967.

Decided Dec. 27, 1967.

Francis A. Scanlan, Kelly, Deasey & Scanlan, Philadelphia, Pa., for appellant.

Martin J. Vigderman, Freedman, Borowsky & Lorry, Philadelphia, Pa. (Abraham E. Freedman, Philadelphia, Pa., on the brief), for appellees.

OPINION OF THE COURT

Before McLAUGHLIN, KALODNER and GANEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Our sole query here is whether a dispute between the appellant multi-employer association, Philadelphia Marine Trade Association, and the representatives of the employees should have been handled under Paragraph "28 Grievance Procedure" of the employment contract between the parties or under Paragraph 13(d) thereof. The matter was brought

to a head on February 28, 1967. Atlantic and Gulf Stevedores, Inc. one of the Association group, was discharging a cargo of frozen meat from a vessel berthed in the Port of Philadelphia. Such meat in cartons is strapped to wooden platforms called pallets. That day two groups of longshoremen were unloading the meat two pallets to a draft or load. While this was going on, a business agent of the Union came to the area and ordered the men to handle the meat one pallet to a draft. The Association has urged since the particular incident that a two pallet draft discharge occurred infrequently and only because of special factors, principally the type of stowage. The agent insisted that the practice was contrary to the employment contract and refused to permit the men to so function. The employer offered to arbitrate and the agent refused. There was a meeting between representatives of the Association and the Union the next day. The Union maintained that the question under the employment agreement was one for negotiation. The Association had the firm view it was arbitrable.

Thereafter on March 7, 1967, the Association filed a complaint in the District Court under the Labor Management Relations Act, 29 U.S.C. § 185, which outlined the controversy. It explained that the same ship, the unloading of which had triggered the litigation, was arriving in the Port of Philadelphia with the balance of its undischarged frozen meat cargo and that another vessel also carrying a frozen meat cargo would so dock around the same date. Because of this an immediate hearing was requested. The matter was heard March 8, 1967. Evidence was presented by both sides. R. E. Coffey, port manager for the Association, gave testimony on behalf of the plaintiff. It was centered on the practice in the Philadelphia harbor with reference to discharge of frozen meat cargoes, particularly as to the use of two pallet drafts. The witness said that he had personal knowledge of the fact that meat had been discharged by the two pallet meth-

od at some previous times. From his records he named cargoes or parts of them so discharged on August 29, 1966, October 21, 1966, December 28, 1966, January 9, 1967, January 23, 1967, February 6 and 7 and February 28, 1967 which latter was the discharge that focused the problem and resulted in the District Court action. It developed that Mr. Coffey had direct knowledge of the December 29, 1966 discharge by two pallet draft. The other discharge information was given him by his supervisors. His list of those ships and their discharge did not show which pallet method had been used. Mr. Owens, superintendent for Lavino Shipping Company was a witness. He first saw meat discharged in two pallet drafts October 1966. The next one he saw was in February 1967. After that he saw that type of discharge from approximately three other vessels. Four years ago he saw television tubes so discharged and in approximately 1965 he saw the same practice with frozen fish. Mr. Doran, stevedore superintendent for Atlantic & Gulf Stevedores at the Philadelphia port, first saw two pallet frozen meat discharges in September 1966. Since then down to recently he witnessed seven or eight of that sort of discharge to and including February 28, 1967. Mr. McGowan, vice president of another stevedore concern which did not handle frozen meat, has seen fungicide, tiles, nails, wrapping paper and TV blanks so unloaded since 1963 down to the "present time." Captain Kristensen has been Philadelphia port captain for Stockard Shipping & Terminal Corporation for the last about six and a half years. He first saw two pallet discharge of frozen meat ship cargo on January 13, 1967, after that on January 18, 1967 and February 9, 1967. In 1966 he saw tiles thus unloaded at least twice.

Mr. Coyle, superintendent for two Philadelphia port concerns, saw two pallet loading of pipe fittings in 1965. He also has seen tile, TV blanks and nails in two pallet discharges. The nails he saw six or seven different times starting June or July 1966. He saw tiles so

disposed of first in 1965, three or four vessels almost right in a row, and the last time prior to the hearing was "Within the past three months." This witness concluded plaintiff's evidence. The defense motion to dismiss on the ground that two pallet practice had not been established was taken under advisement.

The first defense witness was Mr. Moock, International Union Vice President for the Port of Philadelphia area. He has been on that waterfront since 1925. He said that from his personal knowledge "The normal procedure is lifting one pallet at a time." He said he had never seen longshoremen at said port lift two pallets at once until a week prior to the hearing. He averages at least four days a week on the Philadelphia waterfront. This witness stated he never saw two pallet discharge of television tubes, frozen fish, nails, tiles or two pallet loading of fungicide. Generally, he said, he had never seen two pallets of any commodity in a draft. Mr. Askew, president of the Local of the Union which is based in the Philadelphia port, said he had been on that scene for twenty-five years. He described the practice there as to pallets to be one to a draft. Mr. Johnson, business agent of the Local, on the same waterfront thirty years, said that at that port one pallet is handled to a draft, that he had never seen more than one handled in a draft. He was the agent who stopped the longshoremen taking two pallets to a draft, which incident precipitated this suit. Mr. Talmadge, another agent of the Local, testified that the Philadelphia port practice was one pallet to a draft, that the only time he saw two was on March 8, 1967 when the stoppage occurred. Mr. Divine, another Local agent, thirty-one years on said waterfront, said it was one pallet practice there and the only time he saw two was when his partner Johnson stopped the work. Mr. Smith, another Local agent, twenty-four years at the port involved, always found the practice there to be one pallet to a draft. Mr. Kane, assistant financial secretary of the Lo-

cal, on that waterfront since 1933, said the custom always has been one pallet to a draft; he never saw more than that.

Paragraph 28 of the employment contract set up "Grievance Procedure" and an elaborate system of Arbitration. The parts of 28 particularly pertinent to our problem read:

"28. GRIEVANCE PROCEDURE:

All disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of this agreement and all questions involving the interpretation of this agreement other than any disputes or grievances arising under the terms and conditions of paragraph 13(d) hereof, shall be referred to a Grievance Committee, which shall consist of two members selected by the Employers and two members selected by the Union.

\* \* \* \* \* \* \*

Should the terms and conditions of this agreement fail to specifically provide for an issue in dispute or should a provision of this agreement be the subject of disputed Interpretation, the Arbitrator shall consider port practice in resolving the issue before him. If the Arbitrator determines that there is no port practice to assist him in determining an issue not specifically provided for in the collective bargaining agreement or no port practice to assist him in resolving an interpretation of the agreement, the issue shall become the subject of negotiotion between the parties. There shall be no strike and no lockout during the pendency of any dispute or issue while before the Grievance Committee, the Joint Panel or the Arbitrator."

Paragraph 13 is also important. That reads:

"13. The employer to have the right to so regulate the work of stevedoring a ship as to:

(a) Best attain an orderly, safe and efficient movement of the cargo into or out of the vessel.

(b) Protecting the safety and health of the workers.

(c) Making the best use of the skill and aptitude of the workers with the right to apply available mechanism and motive power to minimize wasteful manual work.

(d) Nothing herein contained shall be construed as warranting a demand on the part of the union to change established methods of operation or to change the number of men heretofore employed in gangs, providing that a committee of three representatives of the Union and three representatives of the Employer shall immediately following the execution of this agreement hold meetings for the purpose of reaching an agreement upon the number of men on certain commodities where disputes regarding the number of men may exist. In the event that technological advancements in machinery or methods in the future are introduced by the Employers, the number of men thereforth to be employed for handling the particular commodities shall be the subject of negotiation between the subcommittee herein created. This clause shall not be subject to the grievance and arbitration Clause No. 28."

Appellant argues that there was an admitted dispute involving the interpretation of the bargaining agreement which under the latter and the applicable law should have been submitted to arbitration. United Steelworkers v. Enterprise Wheel & Car Corporation, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) is cited in support of this. The contention is that the question was not excluded by the arbitration clause and that the trial judge erred in holding that Section 13(d) of the agreement controlled. Stressing United Steelworkers v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960), appellant urges that the court had no business weighing the merits of the grievance involved. It attacks the weight of the Union testimony by submitting that though the Union officials allegedly did not see the two pallet operation that does not prove the two pallet method was not used in the past since it was not exclusive and only employed when feasible, depending upon stowage and other factors. It insists that the propriety of the use of the two pallet draft was for the arbitrator's determination. Finally, appellant asserts that the Court's refusal to submit the question to arbitration violates the national labor policy.

Beyond doubt if this controversy is within Paragraph "28. Grievance Procedure" of the existing labor contract between the parties, the District Court was bound to so decide. United Steelworkers v. Enterprise Corporation, supra; United Steelworkers v. American Mfg. Co., supra; United Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

The trial judge substantially accepted plaintiff's evidence. He found as facts that "While the defendant has on occasion unloaded two pallets of cargo to a draft as early as 1963, the use of this method has been very sporadic and not on a regular basis. Even when the two pallet method was employed it was not the exclusive method used on any ship, for one pallet loads were utilized also." He also found that the occasional unloading of two pallet drafts was not known to the union and its officials until the incident of February 28, 1967; that the established pallet practice since they were introduced at the Port of Philadelphia has been the use of one pallet drafts for discharge of the ships' cargo; that two pallet drafts has not been an established practice on that waterfront. He concluded as a matter of law that "The use of two pallet drafts is a change in the established method of operation and the dispute therefore comes within paragraph 13(d) of the labor contract. The dispute in question is not subject to arbitration but rather to negotiation."

The District Court correctly recognized the strong trend of the Supreme Court to arbitration of labor disputes " * *

unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers v. Warrier & Gulf Navigation Co., supra, 363 U.S. pp. 582–583, 80 S.Ct. p. 1353. The trial judge specifically so held in this appeal.

However, the trial court erred in adopting the defense argument that under the employment contract "any change in the established method of operation was subject to negotiation between the parties, not arbitration." Paragraph 13 (d) cannot be so construed. The simple reference in Paragraph 13(d) as to changing methods of operation or number of men in gangs reads, "Nothing herein contained shall be construed *as warranting a demand on the part of the union* to change established methods of operation or to change the number of men heretofore employed in gangs, providing that a committee of three representatives of the Union and three representatives of the Employer shall immediately following the execution of this agreement hold meetings for the purpose of reaching an agreement upon the number of men on certain commodities where disputes regarding the number of men may exist." (Emphasis supplied). As is seen the directive about changing established methods is to the Union alone. It should also be noted that there is no charge or any mention by either side of an existing pallet dispute in 1964 when the agreement was executed.

In addition to the above the Union argues that the next two sentences of Paragraph 13(d) also call for negotiation of the pallet method. The language is "In the event that technological advancements in machinery or methods in the future are introduced by the Employers, the number of men thereforth to be employed for handling the particular commodities shall be the subject of negotiation between the subcommittee herein created." This relates entirely to questions which may arise in the future after the 1964 contract went into effect

which was on October 1, 1964. Pallet discharge in the port of Philadelphia has existed, according to the Union, since the nineteen forties and, since World War II, as found by the judge. He also held in Findings of Fact 6 and 7 that "6. While the defendant has on occasion unloaded two pallets of cargo to a draft as early as 1963, the use of this method has been very sporadic and not on a regular basis. 7. Even when the two pallet method was employed it was not the exclusive method used on a ship, for one pallet loads were utilized also." In the light of the revealed factual situation, the two pallet operation, whatever its extent, was in existence prior to the 1964 employment contract and cannot possibly be brought under the part of 13(d) which concerns only advancements in " * * * methods in the future" which might be then introduced by the Employer.

Appellees conclude with the proposition that the findings of fact were not clearly erroneous and were required by the evidence. The latter was completely devoted to pallet operation in the port of Philadelphia. All of the testimony on behalf of the plaintiff and the defendants was from respectively partisan sources. The judge because of his erroneous conception of the problem before him did pass upon the merits of the method of pallet use in the port since its appearance in the nineteen forties. In line with his decision that the dispute came within 13 (d) he found that it was not subject to arbitration but to negotiation.

From the plain statement of 13(d) the question before us was in no way within the scope of that paragraph and therefore, again by the command of the agreement, it was clearly governed by paragraph "28 Grievance Procedure" as above set out.

The judgment of the District Court will be reversed and the cause remanded for the purpose of entering a judgment that the dispute involved be processed by the parties under paragraph "28 Grievance Procedure" of their current employment contract.