**REF-CHEM COMPANY, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**EL PASO PRODUCTS CO., Respondent.**

**EL PASO PRODUCTS COMPANY, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 25837, 25981, 25990.

United States Court of Appeals
Fifth Circuit.

Nov. 4, 1969.

John Edward Price, John B. Nelson, Fort Worth, Tex., for Ref-Chem Co.

Marcel Mallet-Prevost, Asst. Gen. Counsel, William H. Carder, Atty., N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Glen M. Bendixsen, Attys., N.L.R.B., for National Labor Relations Board.

Charles J. Morris, Dallas, Tex., for intervenor, Intl. Assn. of Heat & Frost Insul. & Asbestos Workers, Local 66, AFL-CIO.

John B. Mason, Odessa, Tex., William D. Deakins, Jr., Ross N. Sterling, Charles L. Berry, Houston, Tex., for El Paso Products Co.; Vinson, Elkins, Searls & Connally, Houston, Tex., of counsel.

Before AINSWORTH and GODBOLD, Circuit Judges, and DAWKINS, District Judge.

GODBOLD, Circuit Judge:

The Board found that Ref-Chem Company and El Paso Products Company, as joint employers, violated § 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the union and by unilaterally changing wage rates. Enforcement of the Board order must be denied.

The plant of El Paso is located at a common situs with other plants in the area of Odessa, Texas, known as the Odessa complex. In 1961 insulation maintenance work [1] in the El Paso plant and in other plants of the complex, was being done by Insulation and Specialties, Inc. (I & S), which had taken over a contract for that work from a predecessor company owned by the same persons.

In 1961 I & S became a party to a multiemployer contract made by a bargaining group of insulation contractors with Local 66.[2] A new multiemployer contract was signed in 1962 to run until June 30, 1965, and at approximately the same time I & S signed a separate agreement with the union with the same expiration date and incorporating the same terms. I & S claimed that its insulation maintenance employees at the Odessa complex were not covered by the contracts. The issue went to arbitration. The arbitration was decided in favor of the union, and it filed suit to enforce the award. I & S transferred its assets to Leona Lee, a new corporation with the same general group of principals, which, with El Paso's consent, assumed the agreement with El Paso. An injunction issued against I & S, requiring it to recognize the union as bargaining agent for the "mechanics and improvers" performing insulation maintenance work for it at Odessa complex plants and to apply the terms of the 1962 contract to them.

Leona Lee, as successor to I & S, began complying with the injunction. This necessitated a pay raise, and beginning December 14, 1964 it began paying the new scale. On January 16, 1965 Leona Lee sought El Paso's consent to the new rate, as it was required to do by the contract with El Paso. Two days later El Paso, without explanation, notified Leona Lee it had decided to terminate the contract. Leona Lee laid off the insulation maintenance men.

El Paso asked Ref-Chem to take over the insulation maintenance, and Ref-Chem agreed to do so. For many years Ref-Chem had performed various types of maintenance and repair work for El Paso at the Odessa complex. Also it engaged in construction of industrial plants. It employed approximately 100 workmen at the complex, divided into numerous crews. Under its existent contract with El Paso, entered in 1963, it could be required on request of El Paso to perform the insulation maintenance work, but it had not previously been called on to do so.

---

1. The work entails installing and keeping in repair insulation and coverings for pipes, tanks, boilers, flues and other thermal equipment. Our description of the work in this opinion is informal and generic and not phrased in words of art that might be necessary to delineate differences between crafts and craft bargaining units.

2. International Association of Heat & Frost Insulators and Asbestos Workers, AFL-CIO.

The foreman and nine men from the Leona Lee insulation maintenance crew were hired by Ref-Chem and began to do the insulation maintenance work for El Paso, assisted in some respects by other Ref-Chem employees having other skills. The workmen were hired at wage rates consistent with Ref-Chem's existent contract, which in some cases were lower than provided by the union contract. Ref-Chem gave no notice to the union of the wage rates.

On June 11, 1965, nineteen days before the union contract would expire, the union demanded of Ref-Chem that it bargain. Ref-Chem did not reply. The union filed charges against Ref-Chem on July 6, and on October 25 filed amended charges charging El Paso as well. The complaint issued November 25. It charged that Ref-Chem was the successor to Leona Lee, and that El Paso had been a joint employer with I & S and Leona Lee and that it was a joint employer with Ref-Chem.

Before the Trial Examiner the Board sought to prove a succession of employers, under the established doctrine that if assets and employees are transferred from one employer to another and the identity of the employing enterprise remains substantially intact, the successor employer must recognize the contract of the union with its predecessor.[3] The evidence adequately supported a conclusion that Leona Lee was such a successor to I & S that it was bound by the union contract with I & S. But the evidence did not show succession between Leona Lee and Ref-Chem, and the Trial Examiner found there was none. He considered it unnecessary to decide whether El Paso was a joint employer with Ref-Chem. He recommended dismissal of the charges.[4]

The Board decision took a different tack. It concluded that El Paso was a joint employer with Leona Lee, that it became a joint employer with Ref-Chem, that no intervening circumstances affected El Paso's obligation to bargain, so that its obligation attached to Ref-Chem when that company became a joint employer.

Substantial evidence justifies the conclusion that El Paso was a joint employer with Leona Lee and that it became a joint employer with Ref-Chem. The terms of the agreements with these two companies gave El Paso the right to approve employees, control the number of employees, have an employee removed, inspect and approve work, pass on changes in pay and overtime allowed. In practice El Paso exercised its control, though in varying degrees. The evidence showed El Paso would "share, or co-determine, those matters governing essential terms and conditions of employment." NLRB v. Greyhound Corporation, 368 F. 2d 778, 780 (5th Cir. 1966).

In its order the Board did not set out case authority, nor are we furnished with any in this court, sustaining the use of the joint employer doctrine to pass the obligation to bargain from one employer to another by means of their common but successive joint employer, where none of the employers is a successor or *alter ego* of another. Assuming, without deciding, that in this particular instance Ref-Chem became subject to the agreement with the union, we conclude that the Board's case fails on other grounds.

To sustain a violation the Board must prove that at the time it occurred the union represented a majority of the employees in an appropriate bargaining unit. NLRB v. Richard W. Kasse Co., 346 F.2d 24 (6th Cir. 1965); Ramada Inns, Inc., 171 NLRB No. 115; Barney Wilkerson Constr. Co., 147 N.L.R.B. 704 (1963). The unilateral wage change violations were found to have occurred on or

---

3. John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Wackenhut Corp. v. International Union, United Plant Guard Workers, etc., 332 F.2d 954 (9th Cir. 1964).

4. El Paso raised before the Trial Examiner the defense that the amended charges bringing in El Paso were filed after expiration of the six months limitation period of § 10(b). The Examiner found it unnecessary to rule thereon.

about January 26 and on July 1. The refusal to recognize and bargain was found to have occurred on January 18 and thereafter. (The Board conclusion of the date of January 18 does not rest on knowledge by Ref-Chem of the union contract or knowledge that the union claimed to represent the men hired, because no such knowledge is shown. It rests on the premise that as a matter of law Ref-Chem acquired the obligation to recognize and bargain at the moment of hiring. The demand for bargaining was not received until June.)

In earlier litigation between I & S and the union, I & S insisted that its insulation maintenance men were not under the multiemployer contract with the union. But it was established that the contract included the employees of I & S performing insulation maintenance work at the Odessa complex, including plants of El Paso, Rexall Chemical Company, and other companies as well. Insulation & Specialties, Inc., 144 N.L.R.B. 1540 (1963).

The Board order defines the unit with which Ref-Chem and El Paso are to bargain as the insulation workmen employed by Ref-Chem at the El Paso plant. Necessarily the order, directed to Ref-Chem and El Paso (who were not members of the employers' association), had to be cast in terms of these two employers rather than the employers' association, and had to reflect the change in employers from I & S to Ref-Chem and El Paso. But the Board has done more than change employers. It narrowed the place of employment from various plants in the Odessa complex to the El Paso plant alone, and it narrowed the work force from all insulation employees of I & S at the complex to those employed by Ref-Chem to do El Paso's work.

The Board came forward with no affirmative proof of majority status either in the multiemployer unit or in the redefined part thereof consisting of the Ref-Chem employees doing El Paso insulation maintenance. There has been no card check, no election, no certification, no other form of proof. In addition

to the changes in boundaries, since the contracts were signed in 1962 the subunit in question has been filtered through a successor corporation, discharges, reemployment at various times by a nonsuccessor, many changes in personnel, and more than two and a half years of a three-year contract. The "Harris crew" is not, as the General Counsel would have us view it, a unitary, monolithic group of fixed size and unchanging composition, sticking together like Musketeers while moving from one employer to another, so that impliedly the same majority, presumed or otherwise, that was working for I & S in 1962 must be still there working for Ref-Chem in 1965. The term "Harris crew" was, as the Trial Examiner made clear, no more than a descriptive term of convenience, and he found it impossible to trace on any continuous basis either the size or the make-up of the crew.

The union waited more than four months after notice that Ref-Chem had taken over the insulation work before demanding bargaining. During that time there had been changes in the Ref-Chem personnel, as discussed below. See Ramada Inns, Inc., supra.

Neither Ref-Chem nor El Paso was a party to the multiemployer contract or a member of the multiemployer unit. If Ref-Chem became bound it was by a double barreled application of the joint employer doctrine *qua* El Paso, itself not an association member. We share the doubt of the Trial Examiner that in all the circumstances of this case the government can avail itself of the presumption that a contractual representative represents a majority and insist upon a heavy burden of clear and convincing evidence to overcome the presumption. See Shamrock Dairy, 119 N.L.R.B. 998 (1957); NLRB v. Local 3, IUEW, 362 F.2d 232 (2d Cir. 1966); Oilfield Maintenance Co., 142 N.L.R.B. 1384 (1963).

"The reasons for the recognition of presumptions by the courts are various. First and foremost is the reason of probability. In certain recurring fact-situations it becomes accepted by the judges

that the proof of fact A renders the inference of the existence of fact B so probable that it is sensible and time-saving to assume the truth of fact B until the adversary disproves it." McCormick, Evidence, § 309, p. 641.

■■ The basis for the presumption arising from execution of a contract is that a contract with less than a majority of the unit employees would itself constitute a violation of the Act by the employer, and the Board presumes that the employer acted lawfully. *Shamrock Dairy, supra,* 119 N.L.R.B. at 1002. But under § 8(f) of the Act an employer in the construction industry may recognize a union without proof of majority representation.

The Board recognized in *Ramada Inns, Inc., supra,* that application of the presumption of a continuing majority is limited by evidentiary considerations of whether it sensibly may be assumed that the fact which it purports to establish is true. In *Ramada* the Trial Examiner found majority status in March, 1966 on the basis of a presumption that a majority status established by authorization cards in July, 1965 had continued. The Board disagreed, recognizing that the presumption had been limited to situations where the union is certified or has been recognized or has reached an agreement, and declined to extend it to the facts before it, not on a mechanistic basis but upon examination of whether the inference of a continuing majority was justified. It held, "We think it clear that in this case such an inference is not reasonably warranted under usual evidentiary standards."[5]

Also we conclude that if the presumption is applied it was overcome by sufficient evidence. The Trial Examiner found, and the record supports, that the union had no members at the Odessa complex. See, S. & M. Mfg. Co., 172 NLRB No. 104 (1968), as to the effect of loss of union adherents. *See also, Ramada Inns, supra,* as to effect of employee turnover and tardiness of the union.

The Trial Examiner found that the insulation maintenance crew had a hard core of regulars, but from time to time irregulars or extras were hired depending on the volume of work. He referred to Harris' testimony that his pre-Ref-Chem crew consisted of 6 or 7 men but his Ref-Chem crew was 11 or 12 (neither of which included extras). Thus the Trial Examiner concluded it was doubtful that the nine men hired by Ref-Chem constituted a majority of the normal complement of the insulation maintenance work force. Three of the nine hired in January were transferred to other plants in the complex in February, which took them outside the Board's redefinition of the sub-unit. In addition to the original nine, two other men who had worked under Harris for I & S were hired, one in March and one in September. Five others were hired at various dates between March and September.

We need not decide in this case whether the redefined and narrowed sub-unit was appropriate. We do decide that the existence of a majority was not established by the use of a presumption of doubtful applicability and dubious probative value, in the face of the evidence to the contrary.

Our disposition of the case makes it unnecessary for us to comment upon the issues of untimeliness of filing charges and sufficiency of the demand for bargaining.

Enforcement is denied.

---

5. In *Ramada* the Board was impressed by the fact that the successor was unaware of the union's representation claim when he took over the business. In the instant case the Trial Examiner found that Ref-Chem had no direct knowledge of the previous difficulties and litigation between Leona Lee and its predecessors and the union, in fact had no knowledge except rumor and hearsay, and that it did not have the same stringent and continuous antiunion policy as did El Paso. There is no evidence that El Paso steered the insulation maintenance men to Ref-Chem for employment.