# JOHN WILEY & SONS, INC., *v.* LIVINGSTON, PRESIDENT OF DISTRICT 65, RETAIL, WHOLESALE AND DEPARTMENT STORE UNION, AFL–CIO.

No. 91. Argued January 9, 13, 1964.—Decided March 30, 1964.

*Charles H. Lieb* argued the cause for petitioner. With him on the briefs was *Robert H. Bloom*.

*Irving Rozen* argued the cause for respondent. With him on the brief was *Milton C. Weisman*.

*Thomas E. Harris* argued the cause for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging affirmance. On the brief were *J. Albert Woll, David E. Feller, Elliot Bredhoff, Jerry D. Anker* and *Michael H. Gottesman.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This is an action by a union, pursuant to § 301 of the Labor Management Relations Act, 61 Stat. 136, 156, 29 U. S. C. § 185, to compel arbitration under a collective bargaining agreement. The major questions presented are (1) whether a corporate employer must arbitrate with a union under a bargaining agreement between the union and another corporation which has merged with the employer, and, if so, (2) whether the courts or the arbitrator is the appropriate body to decide whether procedural prerequisites which, under the bargaining agreement, condition the duty to arbitrate have been met. Because of the importance of both questions to the realization of national labor policy, we granted certiorari (373 U. S. 908) to review a judgment of the Court of Appeals directing arbitration (313 F. 2d 52), in reversal of the District Court which had refused such relief (203 F. Supp. 171). We affirm the judgment below, but, with respect to the first question above, on grounds which may differ from those of the Court of Appeals, whose answer to that question is unclear.

I.

District 65, Retail, Wholesale and Department Store Union, AFL–CIO, entered into a collective bargaining agreement with Interscience Publishers, Inc., a publishing firm, for a term expiring on January 31, 1962. The agreement did not contain an express provision making it binding on successors of Interscience. On October 2,

1961, Interscience merged with the petitioner, John Wiley & Sons, Inc., another publishing firm, and ceased to do business as a separate entity. There is no suggestion that the merger was not for genuine business reasons.

At the time of the merger Interscience had about 80 employees, of whom 40 were represented by this Union. It had a single plant in New York City, and did an annual business of somewhat over $1,000,000. Wiley was a much larger concern, having separate office and warehouse facilities and about 300 employees, and doing an annual business of more than $9,000,000. None of Wiley's employees was represented by a union.

In discussions before and after the merger, the Union and Interscience (later Wiley) were unable to agree on the effect of the merger on the collective bargaining agreement and on the rights under it of those covered employees hired by Wiley. The Union's position was that despite the merger it continued to represent the covered Interscience employees taken over by Wiley, and that Wiley was obligated to recognize certain rights of such employees which had "vested" under the Interscience bargaining agreement. Such rights, more fully described below, concerned matters typically covered by collective bargaining agreements, such as seniority status, severance pay, etc. The Union contended also that Wiley was required to make certain pension fund payments called for under the Interscience bargaining agreement.

Wiley, though recognizing for purposes of its own pension plan the Interscience service of the former Interscience employees, asserted that the merger terminated the bargaining agreement for all purposes. It refused to recognize the Union as bargaining agent or to accede to the Union's claims on behalf of Interscience employees. All such employees, except a few who ended their Wiley employment with severance pay and for

whom no rights are asserted here, continued in Wiley's employ.

No satisfactory solution having been reached, the Union, one week before the expiration date of the Interscience bargaining agreement, commenced this action to compel arbitration.

## II.

The threshold question in this controversy is who shall decide whether the arbitration provisions of the collective bargaining agreement survived the Wiley-Interscience merger, so as to be operative against Wiley. Both parties urge that this question is for the courts. Past cases leave no doubt that this is correct.[1] "Under our decisions,

---

[1] Wiley argues that the Court of Appeals decided that the effect of the merger on the obligation to arbitrate was a question for the arbitrator. The opinion below is unclear. It first states that "the question of 'substantive arbitrability' is for the court not for the arbitrator to decide." 313 F. 2d, at 55. At another point, it says: "We merely hold that, as we interpret the collective bargaining agreement before us in the light of Supreme Court decisions enunciating the federal policy of promoting industrial peace and stability, especially with reference to arbitration procedures set up in collective bargaining agreements, we cannot say that it was intended that this consolidation should preclude this Union from proceeding to arbitration to determine the effect of the consolidation on the contract and on the rights of the employees arising under the contract." 313 F. 2d, at 56–57.

Elsewhere, however, the opinion states: ". . . [W]e think and hold . . . that it is not too much to expect and require that this employer proceed to arbitration with the representatives of the Union to determine whether the obligation to arbitrate regarding the substantive terms of the contract survived the consolidation on October 2, 1961, and, if so, just what employee rights, if any, survived the consolidation." 313 F. 2d, at 57 (footnote omitted). Judge Kaufman, concurring separately, plainly thought that the court had left to the arbitrator the question of whether Wiley was obligated to arbitrate at all. 313 F. 2d, at 65, 66.

whether or not the company was bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the Court on the basis of the contract entered into by the parties." *Atkinson* v. *Sinclair Refining Co.,* 370 U. S. 238, 241. Accord, *e. g., United Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574, 582. The problem in those cases was whether an employer, concededly party to and bound by a contract which contained an arbitration provision, had agreed to arbitrate disputes of a particular kind. Here, the question is whether Wiley, which did not itself sign the collective bargaining agreement on which the Union's claim to arbitration depends, is bound at all by the agreement's arbitration provision. The reason requiring the courts to determine the issue is the same in both situations. The duty to arbitrate being of contractual origin, a compulsory submission to arbitration cannot precede judicial determination that the collective bargaining agreement does in fact create such a duty. Thus, just as an employer has no obligation to arbitrate issues which it has not agreed to arbitrate, so *a fortiori,* it cannot be compelled to arbitrate if an arbitration clause does not bind it at all.

The unanimity of views about who should decide the question of arbitrability does not, however, presage the parties' accord about what is the correct decision. Wiley, objecting to arbitration, argues that it never was a party to the collective bargaining agreement, and that, in any event, the Union lost its status as representative of the former Interscience employees when they were mingled in a larger Wiley unit of employees. The Union argues that Wiley, as successor to Interscience, is bound by the latter's agreement, at least sufficiently to require it to arbitrate. The Union relies on § 90 of the N. Y. Stock Corporation Law, which provides, among other things, that no "claim or demand for any cause" against a con-

stituent corporation shall be extinguished by a consolidation.[2] Alternatively, the Union argues that, apart from § 90, federal law requires that arbitration go forward, lest the policy favoring arbitration frequently be undermined by changes in corporate organization.

Federal law, fashioned "from the policy of our national labor laws," controls. *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, 456. State law may be utilized so far as it is of aid in the development of correct principles or their application in a particular case, *id.,* at 457, but the law which ultimately results is federal. We hold that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement.

---

[2] "The rights of creditors of any constituent corporation shall not in any manner be impaired, nor shall any liability or obligation due or to become due, or any claim or demand for any cause existing against any such corporation or against any stockholder thereof be released or impaired by any such consolidation; but such consolidated corporation shall be deemed to have assumed and shall be liable for all liabilities and obligations of each of the corporations consolidated in the same manner as if such consolidated corporation had itself incurred such liabilities or obligations. The stockholders of the respective constituent corporations shall continue subject to all the liabilities, claims and demands existing against them as such, at or before the consolidation; and no action or proceeding then pending before any court or tribunal in which any constituent corporation is a party, or in which any such stockholder is a party, shall abate or be discontinued by reason of such consolidation, but may be prosecuted to final judgment, as though no consolidation had been entered into; or such consolidated corporation may be substituted as a party in place of any constituent corporation, by order of the court in which such action or proceeding may be pending."

This Court has in the past recognized the central role of arbitration in effectuating national labor policy. Thus, in *Warrior & Gulf Navigation Co., supra,* at 578, arbitration was described as "the substitute for industrial strife," and as "part and parcel of the collective bargaining process itself." It would derogate from "the federal policy of settling labor disputes by arbitration," *United Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 596, if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established; this is so as much in cases like the present, where the contracting employer disappears into another by merger, as in those in which one owner replaces another but the business entity remains the same.

Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by "the relative strength . .. . of the contending forces," *Warrior & Gulf, supra,* at 580.

The preference of national labor policy for arbitration as a substitute for tests of strength between contending forces could be overcome only if other considerations com-

pellingly so demanded. We find none. While the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party,[3] a collective bargaining agreement is not an ordinary contract. ". . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." *Warrior & Gulf, supra,* at 578–579 (footnotes omitted). Central to the peculiar status and function of a collective bargaining agreement is the fact, dictated both by circumstance, see *id.,* at 580, and by the requirements of the National Labor Relations Act, that it is not in any real sense the simple product of a consensual relationship. Therefore, although the duty to arbitrate, as we have said, *supra,* pp. 546–547, must be founded on a contract, the impressive policy considerations favoring arbitration are not wholly overborne by the fact that Wiley did not sign the contract being construed.[4] This case cannot readily be assimilated to the category of those in which there is no contract whatever, or none which is reasonably related to the party sought to be obligated. There was a contract, and Interscience, Wiley's predecessor, was party to it. We thus find Wiley's obligation to arbitrate this dispute in the Interscience

---

[3] But cf. the general rule that in the case of a merger the corporation which survives is liable for the debts and contracts of the one which disappears. 15 Fletcher, Private Corporations (1961 rev. ed.), § 7121.

[4] Compare the principle that when a contract is scrutinized for evidence of an intention to arbitrate a particular kind of dispute, *national labor policy* requires, within reason, that "an interpretation that covers the asserted dispute," *Warrior & Gulf, supra,* pp. 582–583, be favored.

contract construed in the context of a national labor policy.

We do not hold that in every case in which the ownership or corporate structure of an enterprise is changed the duty to arbitrate survives. As indicated above, there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved. So too, we do not rule out the possibility that a union might abandon its right to arbitration by failing to make its claims known. Neither of these situations is before the Court. Although Wiley was substantially larger than Interscience, relevant similarity and continuity of operation across the change in ownership is adequately evidenced by the wholesale transfer of Interscience employees to the Wiley plant, apparently without difficulty. The Union made its position known well before the merger and never departed from it. In addition, we do not suggest any view on the questions surrounding a certified union's claim to continued representative status following a change in ownership. See, *e. g.*, *Labor Board* v. *Aluminum Tubular Corp.*, 299 F. 2d 595, 598–600; *Labor Board* v. *McFarland*, 306 F. 2d 219; *Cruse Motors, Inc.*, 105 N. L. R. B. 242, 247. This Union does not assert that it has any bargaining rights independent of the Interscience agreement; it seeks to arbitrate claims based on that agreement, now expired, not to negotiate a new agreement.[5]

---

[5] The fact that the Union does not represent a majority of an appropriate bargaining unit in Wiley does not prevent it from representing those employees who are covered by the agreement which is in dispute and out of which Wiley's duty to arbitrate arises. *Retail Clerks Int'l Assn., Local Unions Nos. 128 & 633*, v. *Lion Dry*

## III.

Beyond denying its obligation to arbitrate at all, Wiley urges that the Union's grievances are not within the scope of the arbitration clause. The issues which the Union sought to arbitrate, as set out in the complaint, are:

"(a) Whether the seniority rights built up by the Interscience employees must be accorded to said employees now and after January 30, 1962.

"(b) Whether, as part of the wage structure of the employees, the Company is under an obligation to continue to make contributions to District 65 Security Plan and District 65 Security Plan Pension Fund now and after January 30, 1962.

"(c) Whether the job security and grievance provisions of the contract between the parties shall continue in full force and effect.

"(d) Whether the Company must obligate itself to continue liable now and after January 30, 1962 as to severance pay under the contract.

"(e) Whether the Company must obligate itself to continue liable now and after January 30, 1962 for vacation pay under the contract."

---

*Goods, Inc.,* 369 U. S. 17. There is no problem of conflict with another union, cf. *L. B. Spear & Co.,* 106 N. L. R. B. 687, since Wiley had no contract with any union covering the unit of employees which received the former Interscience employees.

Problems might be created by an arbitral award which required Wiley to give special treatment to the former Interscience employees because of rights found to have accrued to them under the Interscience contract. But the mere possibility of such problems cannot cut off the Union's right to press the employees' claims in arbitration. While it would be premature at this stage to speculate on how to avoid such hypothetical problems, we have little doubt that within the flexible procedures of arbitration a solution can be reached which would avoid disturbing labor relations in the Wiley plant.

Section 16.0 of the collective bargaining agreement provides for arbitration as the final stage of grievance procedures which are stated to be the "sole means of obtaining adjustment" of "any differences, grievance or dispute between the Employer and the Union arising out of or relating to this agreement, or its interpretation or application, or enforcement . . . ." There are a number of specific exceptions to the coverage of the grievance procedures, none of which is applicable here.[6] Apart from them, the intended wide breadth of the arbitration clause is reflected by § 16.9 of the agreement which provides, with an irrelevant exception:

> ". . . [T]he arbitration procedure herein set forth is the sole and exclusive remedy of the parties hereto and the employees covered hereby, for any claimed violations of this contract, and for any and all acts or omissions claimed to have been committed by either party during the term of this agreement, and such arbitration procedure shall be (except to enforce, vacate, or modify awards) in lieu of any and all other remedies, forums at law, in equity or otherwise which will or may be available to either of the parties. . . ."

---

[6] Section 16.5 provides:

"It is agreed that, in addition to other provisions elsewhere contained in this agreement which expressly deny arbitration to specific events, situations or contract provisions, the following matters shall not be subject to the arbitration provisions of this agreement:

"(1) the amendment or modification of the terms and provisions of this agreement;

"(2) salary or minimum wage rates as set forth herein;

"(3) matters not covered by this agreement; and

"(4) any dispute arising out of any question pertaining to the renewal or extension of this agreement."

Other provisions of the agreement "which expressly deny arbitration to specific events" are §§ 4.2, 4.4, 6.4.1, 14.4, 16.9.

All of the Union's grievances concern conditions of employment typically covered by collective bargaining agreements and submitted to arbitration if other grievance procedures fail. Specific provision for each of them is made in the Interscience agreement.[7] There is thus no question that had a dispute concerning any of these subjects, such as seniority rights or severance pay, arisen between the Union and Interscience prior to the merger, it would have been arbitrable. Wiley argues, however, that the Union's claims are plainly outside the scope of the arbitration clause: first, because the agreement did not embrace post-merger claims, and, second, because the claims relate to a period beyond the limited term of the agreement.

In all probability, the situation created by the merger was one not expressly contemplated by the Union or Interscience when the agreement was made in 1960. Fairly taken, however, the Union's demands collectively raise the question which underlies the whole litigation: What is the effect of the merger on the rights of covered employees? It would be inconsistent with our holding that the obligation to arbitrate survived the merger were we to hold that the fact of the merger, without more, removed claims otherwise plainly arbitrable from the scope of the arbitration clause.

It is true that the Union has framed its issues to claim rights not only "now"—after the merger but during the term of the agreement—but also after the agreement expired by its terms. Claimed rights during the term of the agreement, at least, are unquestionably within the arbitration clause; we do not understand Wiley to urge that the Union's claims to all such rights have become

---

[7] See Art. VI: Seniority; Art. XV: Welfare Security Benefits; Art. VII: Discharges and Lay-offs; Art. XXIII: Severance Pay; Art. XII: Vacations.

moot by reason of the expiration of the agreement.[8] As to claimed rights "after January 30, 1962," it is reasonable to read the claims as based solely on the Union's construction of the Interscience agreement in such a way that, had there been no merger, Interscience would have been required to discharge certain obligations notwithstanding the expiration of the agreement.[9] We see no reason why parties could not if they so chose agree to the accrual of rights during the term of an agreement and their realization after the agreement had expired. Of course, the Union may not use arbitration to acquire new rights against Wiley any more than it could have used arbitration to negotiate a new contract with Interscience, had the existing contract expired and renewal negotiations broken down.

Whether or not the Union's demands have merit will be determined by the arbitrator in light of the fully developed facts. It is sufficient for present purposes that the demands are not so plainly unreasonable that the subject matter of the dispute must be regarded as nonarbitrable because it can be seen in advance that no award to the Union could receive judicial sanction. See *Warrior & Gulf, supra,* at 582–583.

## IV.

Wiley's final objection to arbitration raises the question of so-called "procedural arbitrability." The Interscience agreement provides for arbitration as the third stage of the grievance procedure. "Step 1" provides for "a conference between the affected employee, a Union Steward and the Employer, officer or exempt supervisory person

---

[8] Wiley apparently concedes the possibility that a right to severance pay might accrue before the expiration of the contract but be payable "at some future date." Brief, p. 38.

[9] Wiley apparently so construes at least part of one of the Union's claims. See note 8, *supra.*

in charge of his department." In "Step 2," the griev-
ance is submitted to "a conference between an officer of
the Employer, or the Employer's representative desig-
nated for that purpose, the Union Shop Committee
and/or a representative of the Union." Arbitration is
reached under "Step 3" "in the event that the grievance
shall not have been resolved or settled in 'Step 2.' " [10]
Wiley argues that since Steps 1 and 2 have not been
followed, and since the duty to arbitrate arises only in
Step 3, it has no duty to arbitrate this dispute.[11] Spe-
cifically, Wiley urges that the question whether "pro-
cedural" conditions to arbitration have been met must
be decided by the court and not the arbitrator.[12]

We think that labor disputes of the kind involved here
cannot be broken down so easily into their "substantive"
and "procedural" aspects. Questions concerning the pro-
cedural prerequisites to arbitration do not arise in a
vacuum; they develop in the context of an actual dis-

---

[10] All of these provisions are contained in § 16.0 of the Interscience
agreement.

[11] In addition to the failure to follow the procedures of Steps 1 and
2, Wiley objects to the Union's asserted failure to comply with § 16.6,
which provides: "Notice of any grievance must be filed with the
Employer and with the Union Shop Steward within four (4) weeks
after its occurrence or latest existence. The failure by either party
to file the grievance within this time limitation shall be construed and
be deemed to be an abandonment of the grievance."

[12] The Courts of Appeals have disagreed on this issue. The First
and Seventh Circuits have held that the courts determine whether
procedural conditions to arbitration have been met. *Boston Mutual
Life Ins. Co.* v. *Insurance Agents' Int'l Union*, 258 F. 2d 516; *Brass
& Copper Workers Federal Labor Union No. 19322* v. *American
Brass Co.*, 272 F. 2d 849. The Third, Fifth, and Sixth Circuits agree
with the Second Circuit's decision in this case that the question of
"procedural arbitrability" is for the arbitrator. *Radio Corporation
of America* v. *Association of Professional Engineering Personnel*, 291
F. 2d 105; *Deaton Truck Line, Inc.*, v. *Local Union 612*, 314 F. 2d
418; *Local 748* v. *Jefferson City Cabinet Co.*, 314 F. 2d 192.

pute about the rights of the parties to the contract or those covered by it. In this case, for example, the Union argues that Wiley's consistent refusal to recognize the Union's representative status after the merger made it "utterly futile—and a little bit ridiculous to follow the grievance steps as set forth in the contract." Brief, p. 41. In addition, the Union argues that time limitations in the grievance procedure are not controlling because Wiley's violations of the bargaining agreement were "continuing." These arguments in response to Wiley's "procedural" claim are meaningless unless set in the background of the merger and the negotiations surrounding it.

Doubt whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration. In this case, one's view of the Union's responses to Wiley's "procedural" arguments depends to a large extent on how one answers questions bearing on the basic issue, the effect of the merger; *e. g.*, whether or not the merger was a possibility considered by Interscience and the Union during the negotiation of the contract. It would be a curious rule which required that intertwined issues of "substance" and "procedure" growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of policy compel such a result.

Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator. Even under a contrary rule, a court

could deny arbitration only if it could confidently be said not only that a claim was strictly "procedural," and therefore within the purview of the court, but also that it should operate to bar arbitration altogether, and not merely limit or qualify an arbitral award. In view of the policies favoring arbitration and the parties' adoption of arbitration as the preferred means of settling disputes, such cases are likely to be rare indeed. In all other cases, those in which arbitration goes forward, the arbitrator would ordinarily remain free to reconsider the ground covered by the court insofar as it bore on the merits of the dispute, using the flexible approaches familiar to arbitration. Reservation of "procedural" issues for the courts would thus not only create the difficult task of separating related issues, but would also produce frequent duplication of effort.

In addition, the opportunities for deliberate delay and the possibility of well-intentioned but no less serious delay created by separation of the "procedural" and "substantive" elements of a dispute are clear. While the courts have the task of determining "substantive arbitrability," there will be cases in which arbitrability of the subject matter is unquestioned but a dispute arises over the procedures to be followed. In all of such cases, acceptance of Wiley's position would produce the delay attendant upon judicial proceedings preliminary to arbitration. As this case, commenced in January 1962 and not yet committed to arbitration, well illustrates, such delay may entirely eliminate the prospect of a speedy arbitrated settlement of the dispute, to the disadvantage of the parties (who, in addition, will have to bear increased costs) and contrary to the aims of national labor policy.

No justification for such a generally undesirable result is to be found in a presumed intention of the parties. Refusal to order arbitration of subjects which the parties

have not agreed to arbitrate does not entail the fractionating of disputes about subjects which the parties do wish to have submitted. Although a party may resist arbitration once a grievance has arisen, as does Wiley here, we think it best accords with the usual purposes of an arbitration clause and with the policy behind federal labor law to regard procedural disagreements not as separate disputes but as aspects of the dispute which called the grievance procedures into play.

With the reservation indicated at the outset (p. 544 and p. 546, note 1, *supra*), the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE GOLDBERG took no part in the consideration or decision of this case.