SERVICE, HOSPITAL, NURSING HOME AND PUBLIC EMPLOYEES UNION LOCAL 47, et al., Plaintiffs-Appellants,

v.

CLEVELAND TOWER HOTEL, INC., et al., Defendants-Appellees.

No. 78–3246.

United States Court of Appeals, Sixth Circuit.

Argued June 22, 1979.

Decided Sept. 26, 1979.

Melvin S. Schwarzwald, Mark A. Rock, Gaines, Stern, Schwarzwald & Robiner Co., L. P. A., Cleveland, Ohio, for Local Nos. 47 and 1.

Douglas J. Paul, Gerald B. Chattman, Chattman, Moss, Chattman, Garfield & Friedlander, Cleveland, Ohio, for Local No. 10.

William I. Fadel, Cleveland, Ohio, for Locals 589, 589A and 589B.

Edward J. Simerka, Gregory Szuter, Schwartz, Einhart & Simerka, Cleveland, Ohio, for Stouffer Corp. and SPS Mgt. Corp.

Howard W. Broadbent, Carney & Broadbent, Cleveland, Ohio, for Samuel H. Miller.

Before EDWARDS, Chief Circuit Judge and CELEBREZZE and LIVELY, Circuit Judges.

CELEBREZZE, Circuit Judge.

This case is before the court on appeal from a judgment entered by the district court for the defendants-appellees in a suit brought pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, seeking enforcement of four collective bargaining agreements. The principal issues on appeal are whether the current owners and operators of Stouffer's Inn on the Square, Cleveland, Ohio are successor employers to the employees of the previous owner of the hotel for purposes of federal labor law and whether the current owners are bound by the terms of collective bargaining agreements entered into by the previous owner and the plaintiff-appellant unions. For the reasons stated below, we affirm.

## I

In the fall of 1976 International Telephone and Telegraph Corporation filed a foreclosure action against Cleveland Tower Hotel, Inc.[1] On November 24, 1976 the state court appointed Arthur B. Modell receiver for the hotel. The court ordered Modell to take charge of hotel operations and requested that he keep the hotel operating during his receivership.

After his appointment the receiver contacted a number of major national hotel owners and operators in an effort to secure a buyer for the hotel. In early 1977 the receiver realized he could not sell the hotel to any single purchaser and he conceived of the idea of bringing together a group of civic-minded Cleveland investors to purchase the hotel at a mortgage foreclosure sale. When it became clear to Modell that he was going to be successful in bringing investors together and that he would be deeply involved in the investor group he resigned as receiver. On March 8, 1977 the state court accepted Modell's resignation and appointed Samuel H. Miller in his stead, giving the new receiver the same responsibilities as his predecessor.

On March 31, 1977 the STS Corporation was formed for the purpose of acquiring the fee title and equity of redemption to the Sheraton-Cleveland from Cleveland Tower Hotel, Inc. On April 8, 1977, the STS Corporation purchased all of the interests of Cleveland Tower Hotel, Inc. and of Thomas R. Lloyd, Cleveland Tower's sole shareholder.

On May 10, 1977, the investor group[2] formed a limited partnership called the Public Square Hotel Company, Ltd. The partnership has as its general partner the Public Square Hotel Company, Inc. The Stouffer Corporation became interested in managing the hotel and agreed to join the limited partnership if it were awarded the management contract.[3] Also occurring on May 10 the investor group and ITT consummated an agreement whereby ITT would sell its first mortgage to the investor group for $2,800,000 and the investor group would acquire all of ITT's right in the foreclosure action. The partnership subsequently purchased other outstanding claims against the hotel from other secured creditors.[4]

On May 19, 1977 the partnership filed a motion to have itself substituted for ITT in the foreclosure proceeding and began to press for foreclosure. The foreclosure sale took place on August 8, 1977 and the partnership represented by Modell placed the only bid. The sale was confirmed by the state court on August 31, 1977 and on September 7, 1977, the sheriff's deed was delivered to the partnership. The receiver closed the hotel on August 1, 1977 due to his inability to secure further financial support for the Sheraton-Cleveland Hotel.

During the term of the receivership the receivers signed collective bargaining agreements with the appellant unions on behalf of the previous owner. The receivers noted on these agreements that they were signing the agreements as receiver only and that the contracts were limited to the term of the receivership. On August 9, 1977 the plaintiff-appellants filed the instant complaint in the district court. The complaint sought a declaration from the district court that the terms of the labor agreements entered into on behalf of the previous owner were binding upon the purchasing partnership and an order requiring

1. ITT's original complaint in state court sought only the appointment of a receiver, but it was later amended to seek foreclosure.

2. The investor group includes the Chessie System, The Higbee Corporation, The Cleveland Stadium Corporation, Eaton Corporation, TRW, Inc., Stouffer Corporation, and Mr. F. J. O'Neil, a principal of Leaseway Corporation.

3. Stouffer created SPS Management Corporation on May 6, 1977 to manage the hotel when the investment group acquired title. SPS Management Corp. is a wholly-owned subsidiary of the Stouffer Corporation.

4. The second largest lien on the hotel was held by the American Bank of Central Ohio and had a face value of $336,000. The third largest lien was held by First Pennsylvania Bank and had a face value of $300,000. The partnership ultimately purchased both of these liens for sums less than their face value.

specific performance of the agreements by the defendants. On January 4, 1978 the district court entered judgment for the defendants.

## II

Appellants' primary contention on appeal is that while the hotel was in receivership the investor group actually moved into control of the hotel property and became involved in the day-to-day operations of the hotel. Appellants argue that by becoming involved in the daily operations of the hotel during the receivership the current owners impliedly assumed the obligations of the collective bargaining agreements in existence. We disagree.

The judgment of the district court was based on two separate findings. The district court found that the defendants and the individuals represented by plaintiff unions never established an employer-employee relationship within the meaning of § 301 of the LMRA and therefore plaintiffs failed to state a cause of action under that section. The district court further found that even if such an employer-employee relationship existed, the defendants were not bound to the terms of the collective bargaining agreements.

With respect to appellants' allegations that defendants became involved in the daily operations of the hotel during the receivership the district court made the following findings:

The hotel remained under the control of the receiver during the entire period the plaintiffs allege that an employment contract was assumed by the eventual purchasers. Officers of the plaintiff unions were aware that the hotel was in receivership. Except for attrition, employees represented by the plaintiff unions worked at the hotel from the time the receiver was appointed in November, 1976 until the hotel was closed on August 1, 1977. Except for attrition supervisory

employees at the hotel remained unchanged from November, 1976 until August 1, 1977. Employees were not informed of any change in their employment relationship with the hotel prior to the closing of the hotel on August 1, 1977, and at all times the terms and conditions of their employment were in accord with the applicable collective bargaining agreements.

Throughout this period, the unions dealt with Laszlo Ravasz who was the General Manager of the hotel and who held that position prior to the receivership. Both receivers put Ravasz in charge of the day-to-day direction of the hotel including the handling of labor matters.

\* \* \* \* \* \*

After his term as receiver, Modell did not direct or control the day-to-day operation of the hotel. As the leader of the prospective purchasing group, however, Modell continued to communicate with Poplar[5] and receiver Miller concerning the affairs of the hotel.

There is no evidence of any express agreement by the defendants to assume the labor agreements at issue. The defendants intended to begin operating the hotel only after conclusion of the foreclosure sale, shutdown of hotel operations, the completion of building renovations, and the hiring of new employees and supervisors.

App. at 93–94 (footnote added).

Based on the above findings the district court concluded that an employer-employee relationship did not exist between the current owners and the individuals represented by the appellant unions. Rather, the district court found that the court-appointed receiver had control of employee relations at the Sheraton-Cleveland and consequently was the employer during the receivership. Since a suit brought pursuant to § 301(a) of the LMRA is one brought "for violation of

---

5. Michael Poplar is an officer and employee of the Cleveland Stadium Corporation of which Modell is president and principal owner. When Modell was appointed receiver he asked Poplar to oversee the financial matters concerning the operation of the hotel during the receivership. Poplar remained in that post during the Miller receivership.

contracts between an employer and a labor organization"[6] and the defendants were not employers within the facts of the present case, the district court ruled the defendants were entitled to judgment. From our review of the record we conclude that the district court applied the appropriate legal principles in deciding this issue and that its findings of fact are substantially supported by record evidence and not clearly erroneous.

Furthermore, if we assume, as did the district court, that the partnership did establish an employer-employee relationship with the employees represented by appellant unions the law of successorship as outlined by the Supreme Court does not support appellants' position. From a close reading of the Supreme Court decisions fleshing out the doctrine of successorship, *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), *NLRB v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), it becomes evident that the defendants are not successor employers within the meaning of federal labor law and are not bound by the terms of the collective bargaining agreements.

The central focus in the successorship inquiry is whether there exists a substantial continuity of identity in the business enterprise across the change in ownership. *See John Wiley & Sons v. Livingston,* 376 U.S. at 551, 84 S.Ct. 909. The factors courts consider as indicia of substantial continuity of identity in the business enterprise include: whether there exists a substantial continuity of identity in the work force

across the change of ownership; whether the new employer is utilizing the same supervisory personnel, machinery, and equipment; whether the new employer is producing the same goods or rendering the same services as the old employer. *See International Union of Electrical, Radio, and Machine Workers v. NLRB,* 196 U.S.App.D.C. ——, 604 F.2d 689 (D.C.Cir. 1979); C. Morris, The Developing Labor Law 1971–75 Cumulative Supplement at 202–18. Though this inquiry is based on a totality of the circumstances, and by its nature highly fact specific, the key factor in determining successorship is whether there exists a substantial continuity of identity in the 'work force across the change in ownership. *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. at 262–65, 94 S.Ct. 2236; *NLRB v. Burns International Security Services,* 406 U.S. at 280–81, 92 S.Ct. 1571; *Nazareth Regional High School v. NLRB,* 549 F.2d 873, 879 (2d Cir. 1977); *Zim's Foodliner, Inc. v. NLRB,* 495 F.2d 1131, 1140 (7th Cir.), *cert. denied,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65 (1974); C. Morris, The Developing Labor Law 1976 Supplement at 104.

The record in the present case is devoid of the continuity of identity in the work force contemplated by *Wiley, Burns,* and *Howard Johnson, supra.* The record does not reflect that the current owners hired a majority of the predecessor's work force or that the predecessor's employees comprised a majority of the new hotel staff. We recognize as basic to this area of federal labor law an unwillingness to compel a new employer to accept contract terms against its will and an unwillingness to force a new employer to hire any of its predecessor's employees unless it chooses to do so.[7] As the Supreme Court stated in *NLRB v.*

6. LMRA § 301(a), 29 U.S.C. § 185(a) provides: Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

7. It is well settled that a new employer, although free to select its own work force, may not refuse to hire the employees of the predecessor solely because they are union members. *See Howard Johnson Co. v. Detroit Local Joint Exec. Bd.,* 417 U.S. 249, 262 n. 8, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Int'l Sec. Serv.,* 406 U.S. 272, 280–81 n. 5, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 184 n. 6, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). C. Morris, The Develop-

*Burns International Security Services*, 406 U.S. at 287–88, 92 S.Ct. at 1582,

> holding . . . [a] new employer bound to the substantive terms of an old collective-bargaining contract may result in serious inequities. A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may discourage and inhibit the transfer of capital.

Therefore we conclude that the defendants-appellees are not successor employers for the purposes of federal labor law, have not expressly or impliedly assumed the obligations of the existing collective bargaining agreements, and have no obligation to honor the terms of those agreements.[8]

Accordingly, for the reasons set out above, the judgment of the district court is affirmed.

EDWARDS, Chief Judge, concurring.

The equities in this case appear to me to favor plaintiffs. It is equally clear, however, that Supreme Court case law, particularly *NLRB v. Burns International Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and *Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974), lends strong legal support to the defendants. The result which Judge Celebrezze has written for appears to be mandated by the *Burns* and *Howard Johnson* cases, and I concur in his opinion.

---

ing Labor Law Cumulative Supplement 215. There is no suggestion in this case that the defendants in any way discriminated in their hiring against former Sheraton-Cleveland employees because of their union membership, activity, or representation.

8. In *NLRB v. Burns Int'l Security Serv.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Supreme Court was confronted with the issues whether a successor employer had a duty under § 8(a)(5) of National Labor Relations Act to bargain with the predecessor's employees' union and whether the successor was bound by the terms of the predecessor's collective bargaining agreement. In *Burns* the Court held that where a majority of the employees hired by the new employer were represented by a recently certified bargaining agent the new employer had a duty to bargain with the bargaining agent. The Court did not, however, find the new employer bound by the terms of the collective bargaining agreements negotiated by the predecessor employer. Upon the facts of this case where the new employer did not hire a majority of the predecessor's work force, *a fortiori*, the defendants are not bound by the terms of the collective bargaining agreements. Those policies which were applied in *Burns* apply with equal force here.

The position of the National Labor Relations Board and that of this court seem to be in agreement. After this lawsuit was filed in the district court the appellants filed three unfair labor practice charges with the Board alleging an unlawful refusal to bargain on the part of the defendants. See NLRB case Nos. 8–CA–11225, 8–CA–11263, 8–CA–11294. Cases 8–CA–11294 and 8–CA–11263 were dismissed by the Regional Director on March 27, 1978, and the Board denied the unions' appeal on July 19, 1978. Case No. 8–CA–11225 was withdrawn by the charging party on August 16, 1977. Upon a review of the authorities, it would be anomalous indeed if we were to find the defendants bound to the terms of collective bargaining agreements negotiated by a predecessor employer where the Board is of the opinion that the defendants have no duty to bargain with the unions who are signatories to those agreements.