**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, and the City of
New York, Plaintiffs,**

v.

**LOCAL 638 ... Local 28 of the Sheet
Metal Workers' International Associa-
tion, Local 28 Joint Apprenticeship
Committee ... Sheet Metal and Air
Conditioning Contractors Association
of New York City, Inc., Defendants.**

**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,**

v.

**SHEET METAL WORKERS INTERNA-
TIONAL ASSOCIATION, LOCAL
UNION NO. 10, et al., Defendants.**

**No. 71 Civ. 2877 (R.L.C.).**

United States District Court,
S.D. New York.

Nov. 23, 1988.

Equal Employment Opportunity Commission, Robert C. Williams, Regional Atty.

James L. Lee, Supervisory Trial Atty., New York City, for plaintiffs.

Anna M. Stathis, Cheryl Kramer, Trial Attys., Edmund P. D'Elia, P.C., New York City, for Local 28 Sheet Metal Workers' Intern. Ass'n (Edmund P. D'Elia and Jamie K. Nicastri, of counsel).

ROBERT L. CARTER, District Judge.

On April 13, 1984, plaintiff EEOC brought an Order to Show Cause why Local 28 of the Sheet Metal Workers' International Association ("Local 28") and the Local 28 Joint Apprenticeship Training Committee Essex/Passaic ("Local 28 JAC"), as the successors in interest to Local 10 of the Sheet Metal Workers' International ("Local 10") and the Local 10 Joint Apprentice Committee ("Local 10 JAC"), should not be found liable for the conduct of Local 10 and the Local 10 JAC in violating a federal district court's order prohibiting Local 10 and its JAC from discriminating against blacks and Puerto Ricans.

On October 17, 1984, the court appointed a Special Master to hear and report on the EEOC's motions. On September 1, 2 and 16, 1987, the Special Master held hearings on the issue of whether Local 28 is the successor to Local 10. On March 9, 1988, the Special Master decided that Local 28 is the successor in interest to Local 10. Special Master's Opinion 4, *EEOC v. Local 28, Sheet Metal Workers' Union,* No. 71 Civ 2877 (S.D.N.Y. March 9, 1988) [1988 WL 25151].

**I.**

On June 5, 1973, Judge Mitchell Cohen of the United States District Court for the District of New Jersey ordered Local 10 to stop discriminating against blacks and Puerto Ricans based upon their race or national origin. *U.S. v. Sheet Metal Workers International Association, Local Union No. 10 et al.,* 6 Fair Empl.Prac.Cas. 1036 (D.N.J.1973). The order was to remain in effect until one year subsequent to when thirty percent of the total sheet metal workers' journeymen and apprentice members were black and Puerto Rican.

By letter dated October 16, 1981, Edward Carlough, General President of the Sheet Workers' International Association ("International"), ordered the merger of Locals 10, 13, 559 and a portion of Local 22 with Local 28, effective as of November 1, 1981. In addition, President Carlough ordered an audit of the books and records of the former locals covering all income, disbursements, assets, and liabilities three months prior to October 1, 1981. Carlough directed Local 10 to turn over all funds, books, records and property to the General Secretary–Treasurer of the International. Local 28 acquired over $200,000 in assets from Local 10.

The merger order directed Local 28 to assume responsibility for Local 10's bargaining agreement (whose term extended until May 31, 1983) and to receive the dues of former members of Local 10. Local 28 thus administered after the merger, and still continues to administer today, the collective bargaining agreement for the geographic area that Local 10 formerly covered. Additionally, subsequent to the merger, the forty-three employers whose employees Local 10 formerly represented continued to employ union members whose bargaining agent is now Local 28.

Local 28 absorbed the membership of Local 10. Journeymen in Local 10 became journeymen in Local 28 and received full credit for their years of continuous good standing in Local 10. Apprentices in Local 10 became apprentices in Local 28. In fact, Local 28 accorded to every such journeyman and apprentice the same rights and privileges he had in Local 10. Local 10 members continued to work in the same shops at the same locations and under the same collective bargaining agreement—i.e., under the same rules concerning wages, benefits, discipline, and working conditions —as prior to the merger.

## II.

Successorship in Title VII cases derives from the doctrine of successorship in labor law, *see, e.g., Musikiwamba v. ESSI, Inc.,* 760 F.2d 740 (7th Cir.1985) ("In our view, the analysis set forth by the Supreme Court to justify successor liability in cases arising under the NLRA also justifies successor liability in employment discrimination cases."); *Bates v. Pacific Maritime Assoc.,* 744 F.2d 705 (9th Cir.1984) ("we have held the successorship doctrine [of labor law] to apply to the Title VII obligations"). The doctrine of successorship in labor law, however, is amorphous and fact-oriented. In every case, the alleged "successor" is always a successor of sorts. At the very least, the alleged "successor" is the entity that replaces the former entity. Thus, the question whether one entity is a successor to another, in the abstract, is not relevant. The real issue is what legal obligations attach to a "successor" entity. No fixed definition of "successor" exists, and no definite set of obligations flows from any determination that one entity is a successor to another. *See* 1 C. Morris, *The Developing Labor Law* 695 (2nd ed.1983).

> [T]he real question in each of these "successorship" cases is, on the particular facts, what are the legal obligations of the new employer to the employees of the former owner or their representative? The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case and the particular legal obligation which is at issue, whether it be the duty to recognize and bargain with the union, the duty to remedy unfair labor practices, the duty to arbitrate, etc. There is, and can be, no single definition of "successor" which is applicable in every legal context.

*Howard Johnson Co. v. Detroit Local Joint Exec. Board, Hotel and Restaurant Employees and Bartenders Int'l Union,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

Notwithstanding the amorphousness of successorship doctrine, precedent provides general principles to guide the court in construing the particular facts before it. The facts, in light of these general principles, and the important policies at stake, persuade the court that Local 28 is the successor in interest to Local 10.

## A.

The first important fact is the relationship between Local 10 and Local 28: Local 10 merged into Local 28 and ceased to exist. According to Section 906(b)(3) of the New York Business Corporation Law, "[t]he surviving or consolidated corporation [in a merger] shall assume and be liable for all the liabilities, obligations and penalties of each of the constitutent corporations. No liability due or obligation to become due, claim or demand for any cause existing against any such corporation ... shall be released or impaired by such merger or consolidation." N.Y.Bus.Corp.Law § 906(b)(3) (McKinney 1963). Although state law is not controlling in federal question cases, it may serve to "aid in the development of correct principles or their application in a particular case." *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 548, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964).

This case involves facts similar to those in *Local 1, Broadcast Employees v. International Brotherh'd of Teamsters*, 461 F.Supp. 961 (E.D.Pa.1978), *aff'd in part, rev'd in part and remanded*, 614 F.2d 846 (3rd Cir.1980), *aff'd*, 598 F.Supp. 178 (E.D. Pa.1984). The International imposed a merger upon two locals, Local 1 and Local 107. Prior to the merger, Local 1 passed a resolution providing that Local 1 would pay its business manager a salary if and when it was financially possible. After the merger, the business manager attempted to collect his salary from Local 107, arguing that the contractual obligations of Local 1 were binding on Local 107 after the merger.

The court held Local 107, the only surviving union after the merger, liable for the salary payments to which Local 1 had agreed. The court explained:

The fallacy of the argument [that Local 1's obligations did not bind Local 107] lies in assuming that upon a merger, all of the contingent liabilities of the nonsuccessor merged organization are legally extinguished. On the contrary, far from being extinguished, they are transferred, in precisely their premerged status, to the successor organization. In other words, upon the merger of Local 1 and Local 107 ... all of Local 1's obligations, whether contingent or otherwise, were transferred to Local 107. Therefore, if Local 1 had a valid pre-merger contingent liability ... that liability, in exactly its same form, was transferred to Local 107 by virtue of the merger, and it became 107's obligation....

461 F.Supp. at 982–83.

The court supported its reasoning by referring to Pennsylvania state law, which stated that the surviving corporation in a corporate merger assumed all liabilities and obligations of the prior corporation. *See id.* at 983. Although Pennsylvania law did not cover mergers of unincorporated associations, such as unions, the court found the corporate laws applicable, since the "policies that find expression in [these corporate laws] are so fundamental." *Id.* Applying that reasoning here, the court finds that Local 10's obligation to comply with the judicial order of June 5, 1973, was transferred to Local 28 upon the merger.

*John Wiley & Sons v. Livingston, Inc.*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), also provides support for this conclusion. The union in *John Wiley & Sons, Inc.*, entered into a collective bargaining agreement with Interscience Publishers, Inc., for a term expiring on January 31, 1962. The agreement contained arbitration requirements but did not make any express provision for binding successors of Interscience. On October 2, 1961, Interscience merged with John Wiley & Sons, Inc., and ceased to exist. Wiley refused to recognize the validity of the bargaining agreement, asserting that the merger terminated those obligations. One week before the end of the Interscience bargaining agreement, the union commenced action in this district seeking to compel arbitration pursuant to § 301 of the Labor Management Relations Act. The court refused relief, *Livingston v. John Wiley & Sons, Inc.*, 203 F.Supp. 171 (S.D.N.Y.1962) (Sugarman, J.), but the Court of Appeals reversed. 313 F.2d 52 (2nd Cir.1963). The United States Supreme

Court granted certiorari. 373 U.S. 908, 83 S.Ct. 1300, 10 L.Ed.2d 411 (1963).

Speaking for the United States Supreme Court, Justice Harlan framed the legal question as "whether Wiley, which did not itself sign the collective bargaining agreement on which the Union's claim to arbitration depends, is bound at all by the agreement's arbitration provision." 376 U.S. at 547, 84 S.Ct. at 913. Emphasizing the importance of promoting the federal policy of settling disputes through arbitration, the Court held:

> that the disappearance *by merger* of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement.

*Id.* at 548, 84 S.Ct. at 914 (emphasis added). Justice Harlan reasoned that the prerogative of owners to rearrange their businesses must be balanced against the important objectives of national labor policy, as embodied in the principles of federal labor law. *Id.* at 549, 84 S.Ct. at 914. The Court added that "[w]hile the principles of law governing ordinary contracts would not bind to a contract an unconsenting successor to a contracting party, a collective bargaining agreement is not an ordinary contract." *Id.* at 550, 84 S.Ct. at 914.

Justice Harlan cautioned, however, that the duty to arbitrate does not necessarily survive every change in corporate structure, notwithstanding the importance of the national policies at stake. He explained that "there may be cases in which the lack of any substantial continuity of identity in the business enterprise before and after a change would make a duty to arbitrate something imposed from without, not reasonably to be found in the particular bargaining agreement and the acts of the parties involved." *Id.* at 551, 84 S.Ct. at 915.

The union merger at issue here is analogous to the corporate merger in *Wiley*. Although Local 10 and Local 28 are unincorporated associations, the general principle *Wiley* establishes that structural reorganizations do not necessarily extinguish all obligations and liabilities remains pertinent. Hence, just as the duty to arbitrate survived the corporate merger in *Wiley*, the duty to comply with a judicial order survives the union merger between Local 10 and Local 28.

Defendant argues that mergers, as a means of structural reorganization, have little or no significance in successorship doctrine, relying on *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182—83 n. 5, 94 S.Ct. 414, 424 n. 5, 38 L.Ed.2d 388 (1973) ("The refusal to adopt a mode of analysis requiring the NLRB to distinguish among mergers, consolidations, and purchases of assets is attributable to the fact that, so long as there is continuity in the employing industry, the public policies underlying the doctrine [of successorship] will be served by its broad application"). This argument is unpersuasive. *See Howard Johnson Co. v. Detroit Local Exec. Bd., Hotel and Restaurant Employees and Bartenders Int'l Union*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

In *Howard Johnson Co.*, the Court acknowledged that it had "recognized that ordinarily there is no basis for distinguishing among mergers, consolidations, or purchases of assets in the analysis of successorship problems," *id.* at 257, 94 S.Ct. at 2240, but it noted two situations in which such distinctions may be relevant to successorship. When a merger is conducted "against a background of state law that embodied the general rule that in merger situations the surviving corporation is liable for the obligations of the disappearing corporation," *id.* (quoting *NLRB v. Burns Int'l Security Services.*, 406 U.S. 272, 286, 92 S.Ct. 1571, 1581, 32 L.Ed.2d 61 (1972)), the reasonable expectations of the parties involved in a merger may be that the surviving corporation will assume the liabilities of the merging entities. Also, when a merger causes the disappearance of one of the merging entities, the merger will leave vested obligations, voluntarily undertaken

by the disappearing entity, unenforced, unless the surviving entity is held liable for these obligations. In the case at bar, both of these situations calling for a distinction between mergers and other types of structural transactions are present.

### B.

The second crucial consideration is the substantial continuity of former Local 10 as merged into Local 28. In all of its recent cases, the United States Supreme Court has unambiguously endorsed "substantial continuity" as crucial in determining successorship. *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 107 S.Ct. 2225, 2236, 96 L.Ed.2d 22 (1987) ("the focus is on whether there is 'substantial continuity' between the enterprises"); *Golden State Bottling Co.*, 414 U.S. at 181, 94 S.Ct. at 423 ("[w]hen a new employer ... has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations, those employees who have been retained will understandably view their job situations as essentially unaltered"); *Burns Int'l Security Services.*, 406 U.S. at 281, 92 S.Ct. at 1579 ("where the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a recently certified bargaining agent there is little basis for faulting the Board's ... ordering the employer to bargain with the incumbent union"); *see also EEOC v. MacMillan Bloedel Containers*, 503 F.2d 1086 (6th Cir.1974) (Title VII case enumerating factors determining whether substantial continuity exists).

The continuity of former Local 10 before and after the merger is quite substantial. Local 28 inherited all assets, operations, records and property of Local 10, including over $200,000 in value, membership rolls, and collective bargaining agreements. Special Master's Opinion at 13, 34; *supra* p. 740. Local 28 also absorbed the total membership of Local 10. Every one of the

539 journeymen and 132 apprentices in Local 10 became a member of Local 28 upon the merger. Special Master's Opinion at 14; *supra* p. 740.

Moreover, Local 28 administers the geographical region that Local 10 administered prior to the merger, Special Master's Opinion at 35; *supra* p. 740, and the wages, terms and conditions of employment were substantially the same, after the merger, for former members of Local 10. Special Master's Opinion at 14; *supra* p. 740. Additionally, members of former Local 10 continued to work in the same trade and for the same employers after the merger with Local 28. Special Master's Opinion at 39; *supra* p. 740. Lastly, an emphasis on the "employees' perspective," *Fall River Dyeing & Finishing Co.*, 107 S.Ct. at 2236; *NLRB v. Jefferies Lithograph Co.*, 752 F.2d 459, 466 (9th Cir.1985) ("the law focuses on whether business operations, 'as they impinge on union membership, remain essentially the same after the transfer of ownership'") (quoting *NLRB v. Hudson River Aggregates*, 639 F.2d 865, 869 (2d Cir.1981), confirms that "substantial continuity" between Local 10 and Local 28 exists.

Defendant argues that "substantial continuity" does not exist because of several changes. Defendant notes, *inter alia*, that most of the supervisory personnel of former Local 10 ceased to have significant responsibilities after the merger, that the opportunities to run for political office expanded for former members of Local 10, that the pool of available contractors increased, and that the size of Local 28 grew.

Defendant's arguments simply miss the mark. For example, an increase in the size of Local 28 is not determinative. Most mergers will result in an increase in the size of the surviving entity, almost by definition. *Jeffries Lithograph Co.*, 752 F.2d at 465–66; *Hudson River Aggregates*, 639 F.2d at 869. Other arguments contradict the findings of the Special Master.[1] For example, the Special Master found that the former officers of Local 10 continued to

1. Pursuant to Rule 53(e)(2), F.R.Civ.P., the court shall accept the Special Master's findings of fact unless "clearly erroneous." A finding of fact is "clearly erroneous" only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.

serve in the Local 28 organization in a significant capacity. Special Master's Opinion at 14, 15, 37. The court cannot say that these findings are "clearly erroneous," notwithstanding the availability of some evidence to the contrary.

Even if everything defendants say is true concerning the changes that occurred after the merger, that which remained the same substantially overshadowed any of the changes defendants point out. None of the changes that may have occurred upon the merger between Local 10 and Local 28 was significant enough to have had a major impact on the daily lives of the rank and file of former Local 10 members; thus, from the perspective of the employees, substantial continuity exist.

### C.

The third vital factor is that Local 28 had notice of the liabilities and obligations of Local 10, including the outstanding judicial order of June 5, 1973. Notice is an important criterion in determining successorship. *See, e.g., Golden State Bottling Co.,* 414 U.S. at 185, 94 S.Ct. at 425 (successor employer held in privity with predecessor when former had knowledge of unfair labor practices of latter); *MacMillan Bloedel Containers,* 503 F.2d at 1094 (specifying notice as one of the factors to be used in determining successorship); *Perma Vinyl Corp.* 164 N.L.R.B. 968, 969 (1968) (requiring notice for a finding of successorship). In some cases, notice may even be a necessary criterion for finding successorship. *See, e.g.,* 414 U.S. at 185, 94 S.Ct. at 425 ("since the successor must have notice before liability can be imposed ...").

Local 28 had notice, prior to the merger, of Local 10's general obligations and liabilities. In the letter ordering the merger of Local 10 and Local 28, issued two weeks prior to the merger, the president of the International, Edward Carlough, ordered a complete audit, by an independent auditor, of the assets and liabilities of Local 10 for the three months prior to October 1, 1981. *See* Plaintiff's Exhibit 1 para. 2; *supra* p. 2. Moreover, Carlough directed former Local 10 to turn over all funds, books and records to the General Secretary–Treasurer, who would forward these materials to the Financial Secretary–Treasurer of Local 28. *See* Plaintiff's Exhibit 1 para. 3; *supra* p. 2.

If Local 28 did not become aware of all of the liabilities of Local 10 prior to merger, the fault lies not with the beneficiaries of such obligations, but with those who were responsible for discovering the liabilities, i.e., the independent auditor or the relevant officers in the union organization. The court will not permit the mistakes of union officials to extinguish the legal rights of the beneficiaries of the union's obligations. To permit this would be to sanction, and even to encourage, such carelessness. If Local 28 did not have notice of all of the outstanding obligations of Local 10, the minority workers who stand to benefit from the court's order will not be made to suffer for the negligence of those in the union organization, or those hired by the union, who failed to give Local 28 adequate notice.

Additionally, the Special Master found that Local 28 not only had notice of the general liabilities of Local 10, but had actual notice specifically of the judicial order of June 5, 1973. Special Master's Opinion at 31. To be sure, Local 28 officials may have testified that they had no knowledge of the order prior to the merger, but the Special Master rejected their testimonies, finding them "incredible and self-serving." *Id.* at 16–17. Although some evidence is contrary to the finding of the Special Master, the court remains unconvinced that his findings of fact are "clearly erroneous," particularly since due regard must be given to the opportunity of the Special Master to judge the credibility of the witnesses. *Brown v. Wesley's Quaker Maid, Inc.,* 771 F.2d 952, 956 (6th Cir.1985), *cert. denied,*

2d 518 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1947)).

The court will not reevaluate the evidence or make new findings of fact. In the application of the "clearly erroneous" principle, the court will defer to the opportunity of the Special Master to judge the credibility of the witnesses. *See* C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2614, 810 (1987). Hence, the findings of the Special Master come with a strong presumption of validity. *Id.*

479 U.S. 830, 107 S.Ct. 116, 93 L.Ed.2d 63 (1986); C. Wright & A. Miller, *Federal Practice and Procedure* § 2614, 810.[2]

### D.

The fourth significant fact is the importance of the federal policies at stake. In developing successorship doctrine, the United States Supreme Court has always been concerned about the consequences for federal policies, examining the underlying national interests in every case. In *John Wiley & Sons,* the Court stated: "The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship." 376 U.S. at 549, 84 S.Ct. at 914. The Court then added that the national policy of settling disputes through arbitration required "compelling" considerations to overcome it and that it found none in the instant case. *Id.* at 549–50, 84 S.Ct. at 914.

The Court in *Burns* also resorted to an analysis of the underlying policies at stake. Acknowledging that preventing industrial labor strife is an important federal aim, the opinion went on to say that "Congress has not chosen to make the bargaining freedom of employers and unions totally subordinate to this goal." 406 U.S. at 287, 92 S.Ct. at 1582. The Court explained that "allowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, without any official compulsion over the actual terms of the contract." *Id.* (quoting *H.K. Porter Co. v. NLRB,* 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970)).

In *Golden State Bottling Co.,* the Court highlighted the need to balance conflicting interests and emphasized the national policy of protecting the employee. *See* 414 U.S. at 181–82, 94 S.Ct. at 423–24. The Court added that its "refusal to adopt a mode of analysis requiring the Board to distinguish among mergers, consolidations, and purchases of assets is attributable to the fact that ... the public policies underlying the doctrine will be served by its broad application." *Id.* at 182 n. 5, 94 S.Ct. at 424 n. 5. Determining successorship in the case under review, the Court analyzed the crucial policy-oriented considerations: "Avoidance of labor strife, prevention of a deterrent effect on the effect of the exercise of rights guaranteed employees ... and protection for the victimized employee—all important policies subserved by the National Labor Relations Act ...—are achieved at a relatively minimal cost...." *Id.* at 185, 94 S.Ct. at 425.

*Howard Johnson Co.* explained that the real issue in successorship cases is to try to answer the question of what obligations a "successor" corporation assumes from a predecessor. The opinion commented: "The answer to this inquiry requires analysis of the interests of the new employer and the employees and of the policies of the labor laws in light of the facts of each case...." 417 U.S. at 262 n. 9, 94 S.Ct. at 2243 n. 9. The Court in *Fall River Dyeing & Finishing* justified its focus on the perspective of the employee, when determining the successorship issue, by referring to the NLRA's "policy of industrial peace." 107 S.Ct. at 2236.

Here likewise are important policies at stake that influence significantly the outcome of the successorship issue. The first policy is respect for the federal courts. Only a finding of successorship will preserve the judgment and order of the federal district court entered on June 5, 1973, requiring Local 10 to integrate its ranks racially. To find otherwise is to extinguish the court order, because Local 10 ceased to exist after the merger, leaving no one to comply with the judicial order except Local 28. A finding of no successorship would not only disrespect the final decree of a federal court by extinguishing it, but would also encourage future "mergers" designed to evade judicial orders and judgments.

---

**2.** Defendant argues that a finding of successorship would violate Rule 65(d), F.R.Civ.P., because Local 28 did not have actual notice. Since the court finds that Local 28 did have actual notice, the argument loses its force.

Parties intent on escaping liability under a federal decree could simply "merge" and disappear, claiming that the obligation to obey the court order disappeared as well, as defendants in this case try to do.

The second policy is the general implementation of national policies protecting employees, embodied in national legislation such as the NLRA and Title VII. The importance of equal opportunity needs little elaboration, being one of the most fundamental federal goals. If the *Wiley* court would permit only "compelling" considerations to override the national labor policy of settling disputes through arbitration when deciding the successorship issue, *see* 376 U.S. at 549–50, 84 S.Ct. at 914–15, this court requires at least "compelling" considerations to override the more fundamental national policy of equal opportunity; and just as the *Wiley* court found none, *see id.* at 550, 84 S.Ct. at 914, so this court also finds none.

For the above reasons, this court affirms the finding of the Special Master that Local 28 is the successor in interest to Local 10.

IT IS SO ORDERED.