CLARK COUNTY PUBLIC EMPLOYEES ASSOCIATION, APPELLANT, v. WILLIAM PEARSON, KAREN HAYES, THALIA DONDERO, BRUCE WOODBURY, MANUEL CORTEZ, JAY BINGHAM, AND PAUL CHRISTENSEN, CLARK COUNTY COMMISSIONERS; EX OFFICIO, THE BOARD OF TRUSTEES OF THE UNIVERSITY MEDICAL CENTER OF SOUTHERN NEVADA, RESPONDENTS.

No. 20404

September 14, 1990                                798 P.2d 136

---

*Easterly & Armstrong* and *David Lockie,* Elko, for Appellant.

*Rex Bell,* District Attorney, and *Paul D. Johnson,* Deputy District Attorney, Clark County, for Respondents.

# OPINION

By the Court, ROSE, J.:

The sole question presented by this appeal is whether the district court erred in determining that the parties' three labor disputes are not arbitrable under the parties' collective bargaining agreement. Appellant has pointed to provisions of the collective bargaining agreement which at least arguably cover these disputes, but whether the parties intended these disputes to be arbitrable is not certain. Precisely because the question of arbitrability is in doubt, however, we hold that the district court's order staying arbitration must be reversed and this case remanded with instructions that the district court enter an order compelling arbitration of these disputes. If the question of arbitrability is in genuine doubt, our previous decisions clearly require that doubt to be resolved in favor of arbitrability.

## FACTS

In 1986, the University Medical Center of Southern Nevada (UMC) initiated a "clinical ladder program" under which nurses could receive added proficiency pay for fulfilling certain proficiency requirements. The documentation on the ladder program contains the heading, "Personnel Policies and Procedures." In September 1988, UMC and the Clark County Public Employees Association (CCPEA) entered into a collective bargaining agreement which covers the nurses, but does not expressly address the clinical ladder program. Some time thereafter, UMC terminated the ladder program. In response, on April 10, 1989, CCPEA filed a formal demand for arbitration on three disputes: (1) whether the clinical ladder program as a whole is incorporated into the collective bargaining agreement; (2) whether individual "contracting agreements" entered into by nurses as part of the program are incorporated into the collective bargaining agreement; and (3) whether UMC has failed to compensate nurses with proficiency pay and reimbursement of expenses for activities undertaken pursuant to the program. UMC refused to arbitrate and applied for an order staying arbitration from the district

court. CCPEA then filed a complaint that requested an order compelling arbitration. The district court granted UMC's application and ordered arbitration on these disputes to be stayed indefinitely. CCPEA appeals the order granting the stay.

Article 10 of the collective bargaining agreement subjects any "grievance" to binding arbitration. The issue presented is · whether the three disputes surrounding the ladder program constitute "grievances." In pertinent part, Article 10 defines the scope of grievances as follows:

### ARTICLE 10
### Grievance Procedure

2. For the purposes of this Agreement, a grievance shall be defined to mean a *dispute* between an employee(s) and/or the Association and UMC *over the interpretation or application of the express terms of this Agreement.*

3. Disputes *specifically excluded* in other articles of this Agreement *from the grievance appeal and arbitration procedure set forth herein* shall not be construed as in the purview of this Article 10.

(Emphasis added.)

### LEGAL DISCUSSION

I. *Standards of appellate review of the question of arbitrability.*

Whether a dispute is arbitrable is essentially a question of construction of a contract. Thus, the reviewing court is obligated to make its own independent determination on this issue, and should not defer to the district court's determination. Local U. No. 77 v. Public Util. Dist. No. 1, 696 P.2d 1264, 1266 n.2 (Wash.Ct.App. 1985). Unless the parties clearly and unmistakably provide otherwise in their agreement, the question of arbitrability is to be decided by the district court, not the arbitrator. Int'l Assoc. Firefighters v. City of Las Vegas, 104 Nev. 615, 620 n.6, 764 P.2d 478, 481 n.6 (1988) (quoting AT&T Technologies v. Communications Workers of America, 475 U.S. 643, 649 (1986)).[1] Unlike the bargaining agreement in *Firefighters,* the agreement in the present case does not provide that the arbitrator shall make the threshold determination of arbitrability. Therefore, the district court was authorized to make the determination regarding arbitrability.

---

[1]Although we follow the majority rule just stated, we note that there is a split of authority on this point, with a minority of courts holding that the arbitrator should decide arbitrability in doubtful cases. The Illinois Supreme Court recently enunciated the minority view in some detail in Donaldson, Lufkin & Jenrette v. Barr, 530 N.E.2d 439 (Ill. 1988).

"Nevada courts resolve all doubts concerning the arbitrability of the subject matter of a dispute in favor of arbitration." *Firefighters,* 104 Nev. at 618, 764 P.2d at 480 (citing Exber, Inc. v. Sletten Constr. Co., 92 Nev. 721, 729, 558 P.2d 517, 522 (1976)). Disputes are presumptively arbitrable, and courts should order arbitration of particular grievances "unless it may be said with *positive assurance* that the arbitration clause is not susceptible of *and* interpretation that covers the asserted dispute." *Firefighters,* 104 Nev. at 620, 764 P.2d at 481 (quoting *AT&T Technologies,* 475 U.S. at 650) (emphasis added). Moreover, the U.S. Supreme Court has stated that, in cases involving broadly worded arbitration clauses, "in the absence of any express provision excluding a *particular* grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Technologies,* 475 U.S. at 650 (emphasis added) (citation omitted). Finally, Nevada's Uniform Arbitration Act prohibits courts from considering the merits of the underlying disputes in making the more limited threshold determination of arbitrability. NRS 38.045(5) provides that "[a]n order for arbitration shall not be refused on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim sought to be arbitrated have not been shown." The Court in *AT&T Technologies* also cautioned against considering the merits of the dispute:

> Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer had violated the collective bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

*AT&T Technologies,* 475 U.S. at 650. A drafter of the national Uniform Arbitration Act points out that there is a serious risk that courts will make the determination of arbitrability on the basis of an evaluation of the underlying merits of a dispute. Pirsig, *Comments on Arbitration Legislation and the Uniform Act,* 10 Vand. L. Rev. 685, 695 (1957). Courts must guard against this intrusion into labor-management relations.

II.   *The arbitrability of the parties' three disputes.*

Without passing in any way on the underlying merits of the parties' three disputes, we hold that these disputes are arbitrable. These disputes are to be decided by an arbitrator because we cannot say with positive assurance that the arbitration clause is

not susceptible of any interpretation covering these disputes, there is no express provision excluding these particular disputes from arbitration, and there is no extrinsic evidence of intent to exclude these disputes from arbitration. Under the arbitration clause in Article 10, arbitrability turns on interpretation of other substantive provisions of the collective bargaining agreement. At least two articles of the parties' bargaining agreement are clearly susceptible of an interpretation covering these disputes. Article 5 states in pertinent part:

## ARTICLE 5
### Management Rights

1.   UMC is entitled, without negotiation, to the sole right and authority to operate and direct the affairs of UMC in all its various aspects. Those rights include but are not limited to the following:

. . . .

(g) Promulgate, revise and modify rules, regulations and *personnel policies.*

. . . .

2.   All rights *and responsibilities* of UMC *not specifically modified by this agreement shall remain the functions of UMC.* The above enumerated management rights shall not contravene the expressed terms of this Agreement and shall be subject thereto.

(Emphasis added.)

Without passing on the merits of the parties' disputes, we note that paragraph two may have particular application to the parties' third dispute concerning proficiency pay and reimbursement for activities previously undertaken by nurses pursuant to the ladder program. If UMC has duties to award proficiency pay and reimbursement for activities already undertaken pursuant to the clinical ladder program, these duties certainly could be termed "responsibilities." Such responsibilities were not specifically modified by the parties' agreement. Although susceptible of other interpretations, the phrase "shall remain the functions of UMC" at least arguably obligates UMC to carry through on any preexisting obligations owing to nurses who satisfied program requirements. Under NRS 38.045(5), it is for the arbitrator, not the courts, to decide on the merits whether and to what extent this phrase obligates UMC to compensate these nurses. Courts must resist the temptation to reach the merits of these interpretive issues. If the issue is arbitrable, courts may intervene *after* the arbitrator makes an arbitrary or irrational award, but not before. The parties' third dispute is very similar to a traditional wage

dispute. Requiring these nurses to pursue individual contract actions in court against UMC, instead of arbitration, hardly seems conducive to good labor-management relations or the efficient disposition of controversies.

Paragraph two is also susceptible of interpretations covering the parties' first two disputes. For example, even if UMC has the power to terminate the program under paragraph 1(g), paragraph two may mean that the ladder program was incorporated into the parties' agreement until such time as UMC elected to terminate the program, with arbitration to be required for disputes arising under the program prior to its termination. UMC very possibly had many personnel policies which it continued after signing this agreement, even though the policies were not specifically enumerated in the agreement. We cannot say with positive assurance that the clinical ladder program was not such a policy.

A second article in the agreement which is susceptible of an interpretation covering these disputes is Article 28, which provides in pertinent part:

### ARTICLE 28
#### Education/Training

1. UMC is committed to encourage and assist its employees in increasing and broadening their *skills and knowledge* through continued education in areas that will contribute to their job performance with UMC. To this end, UMC *agrees* to establish education *and training* programs and *policies* that will support this commitment.

. . . .

. . . .

4. UMC *shall* maintain an in-service education program which includes assignment-related training.

. . . .

. . . .

7. If UMC requires an employee to attend an educational program outside of the hospital, the time spent at such a meeting shall be considered as work time, and the employee shall be reimbursed for all fees and travel expenses incurred in connection therewith.

(Emphasis added.)

Paragraphs one and four arguably support CCPEA's contentions that the ladder program, and individual contracts entered into thereunder, were incorporated into the collective bargaining agreement. As described in UMC's documentation, the ladder program certainly could be classified as one of the "training programs and policies" referred to in paragraph one. The clinical

ladder program is more than a simple wage incentive for productivity; it is a training program to increase nurses' proficiency. In order to qualify for proficiency pay, nurses are graded on several criteria, such as "Knowledge/Skill." Certainly this program falls under UMC's general commitment, stated in paragraph one, to increase employees' "skills and knowledge."

Paragraph seven at least arguably supports the nurses' claims for reimbursement for personal expenses incurred in connection with the program. While the voluntary ladder program does not permit reimbursement for most personal expenses, some expenses are reimbursable under the program. If participating nurses incurred expenses in any activities outside of the hospital, paragraph seven at least arguably supports the claim for reimbursement. The strength of the underlying reimbursement and other claims are irrelevant to our determination of arbitrability, so long as the claims are colorable. Indeed, the record contains insufficient evidence for this court even to begin to evaluate the merits of the nurses' claims. This evidence will come out before the arbitrator on the merits. Once the arbitrator makes a decision, courts will have a much firmer record on which to assess the validity of the parties' claims.

We fully recognize that other courts have given narrower interpretations to clauses like the CCPEA's which limit arbitration to disputes arising under *express* contract provisions. Based on the word "express," these courts have ruled against arbitrability on the grounds that the subject matter of the asserted disputes was not *expressly enumerated* in the bargaining agreement. *See* Croom v. City of DeKalb, 389 N.E.2d 647 (Ill.App. 1979). The result reached in *Croom,* however, is simply inconsistent with the principles stated in *Firefighters* and *AT&T Technologies.* To construe the parties' phrase, "interpretation or application of the express terms of this Agreement," as a limitation to subject matters expressly enumerated in the agreement would be both unrealistic *and* counter to the legal presumptions in favor of arbitrability. Any drafter of legal documents realizes that parties will not always be able to anticipate, or desire to specify, every contingency in the express language of an agreement. Businesses change, and disputes may arise which, although not expressly covered by the terms of an agreement, are covered by its spirit or by clear implication from the express terms. *Application* or *interpretation* of express contractual terms almost by definition goes beyond the express terms themselves. In accord with the foregoing, other courts have rejected the narrow interpretation

accorded these clauses in cases such as *Croom.* An example of such a case of which we approve is *Local U. No. 77, supra.*[2]

UMC argues that two provisions in the agreement constitute express exclusions of these disputes from arbitration. First, UMC points to Article 5, paragraph 1(g), quoted above. UMC argues that, since the ladder was a personnel policy, this provision expressly excludes any disputes arising under the clinical ladder program from arbitration. We disagree. First, paragraph 1(g) simply is not an express provision excluding a *particular* grievance from arbitration within the meaning of either *AT&T* or the parties' bargaining agreement. The parties' arbitration clause excludes from arbitration disputes which are "specifically excluded in other articles of this Agreement from the grievance . . . procedure." Examples of such express exclusions referred to in the arbitration clause are Article 32, paragraph five and Article 33, paragraph four. Article 32, paragraph three provides for a committee to investigate health and safety problems in the work place. Article 32, paragraph five provides that "[d]isputes arising under Section 3 of this Article are not subject to resolution under the grievance procedure." Article 32, paragraph five, constitutes

---

[2]In *Local U. No. 77,* a utility began staffing certain "energy conservation consultant" positions with non-union workers. The union maintained that these should be union positions, but the utility disagreed. The utility workers' union sought a court order compelling the utility to arbitrate this dispute. The arbitration clause provided: "Any dispute between the District and the Union or between the District and any employee covered by this Agreement concerning the *interpretation, application,* claim of breach or violation of the *express* terms of this Agreement shall be deemed a grievance." *Local U. No. 77,* 696 P.2d at 1267 n.3 (emphasis added). The parties' contract discussed various job classifications, but did not specifically discuss energy conservation consultants. The district court refused to order arbitration.

The court of appeals reversed and remanded with instructions that the district court order arbitration. The court specifically rejected the argument that the clause "express terms of this Agreement" limited arbitration to disputes arising under *express* contractual provisions; this clause was insufficient to rebut the strong presumption in favor of arbitration. The court also specifically rejected the argument that the failure to incorporate the non-union positions into the contract during contract negotiations indicated an intent not to arbitrate these disputes. The court reasoned that simple failure expressly to specify these positions in the contract did not constitute "the most forceful evidence of a purpose to exclude" the dispute from arbitration, as required in previous decisions of the U.S. Supreme Court. *Id.* at 1268. The court concluded that "a *court's* inquiry is at an end if the complaint on its face calls for an interpretation of the agreement." *Id.* at 1267 (citing United Steelworkers of Am. v. American Mfg. Co., 363 U.S. 564, 568 (1960)). Since the workers argued that the energy conservation consultant positions might fall within the term "metermen" in the contract, the court concluded, the dispute at least arguably fell under the contract and, hence, was arbitrable.

a specific exclusion from arbitration. Article 5, paragraph 1(g), does not.

Additionally, assuming that the ladder program is a personnel policy, paragraph 1(g) might well give UMC the power to modify, or possibly even terminate, the ladder program. It does not *necessarily* follow, however, that UMC can disregard any contractual obligations to nurses arising *before* the program was terminated. There is a distinction between the ladder program as a personnel policy and individual "contracting agreements," as CCPEA refers to them, entered into pursuant to the policy. In short, the ladder program may comprise both a personnel policy, and contracts for participating nurses. The thrust of the nurses' grievances appears to be contractual, and paragraph 1(g) does not address the contractual components of personnel policies. Therefore, we cannot state with positive assurance that paragraph 1(g) excludes the nurses' disputes from arbitration. Nor does paragraph 1(g) necessarily mean that the parties never intended any disputes arising under the program to be covered by the bargaining agreement. Since the ladder program pre-dated the collective bargaining agreement and the parties did not eliminate the program in the agreement, the parties may have tacitly intended to incorporate the ladder program, among several other "personnel policies," into the agreement until such time as UMC elected to terminate the program pursuant to paragraph 1(g). This question will be for the arbitrator to determine in addressing the merits of these grievances.

The second principal provision which CCPEA claims is an express exclusion of these disputes from arbitration reads as follows:

## ARTICLE 36
### Entire Agreement

The parties acknowledge that during the negotiations resulting in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any and all subjects or matters . . . . All rights and duties of both parties are specifically expressed in this Agreement and such expression is all-inclusive. Any *benefit* existing prior to this Agreement is negated unless *specifically incorporated* into this agreement.

(Emphasis added.)

This does not constitute an exclusion sufficiently clear to support a stay of arbitration for three reasons. First, under the arguments made above, all three disputes at least arguably *are*

"specifically incorporated" into the Agreement. It will fall to the arbitrator to resolve these disputes on the merits. Second, it is inherently unreasonable to construe this article to operate to extinguish the nurses' rights to added pay or reimbursement for activities the nurses undertook *before* the parties signed this agreement. Did the parties intend Article 36 to negate nurses' rights to proficiency pay based on their efforts *before* the agreement was signed or before the program was terminated? We cannot answer in the affirmative with positive assurance. This creates an ambiguity for the arbitrator to resolve. Third, CCPEA points out that the term "benefit" generally is *not* construed to refer to reimbursement or added pay, but, rather, to ancillary benefits such as health or sick leave; this, too, creates a question of interpretation for the arbitrator.

Finally, we note that the record contains no extrinsic evidence of the parties' bargaining history. It is possible that the parties intended some provision of their agreement to exclude the clinical ladder program from arbitration. It is equally possible, however, that the parties tacitly intended the existing clinical ladder program to become part of the agreement until such time as the program was terminated, just like other personnel policies which may not have been expressly enumerated in the agreement.

## CONCLUSION

The parties' collective bargaining agreement is silent as to the clinical ladder program, but the parties' disputes are at least arguably covered by provisions in the agreement. Since there is substantial doubt as to whether these disputes are arbitrable, the previous decisions of this court require that doubt to be resolved in favor of arbitration. If there is any doubt as to arbitrability, "the parties are not to be deprived by the courts of the benefits of arbitration, for which they bargained—speed in the resolution of the dispute, and the employment of the specialized knowledge and competence of the arbitrator." *Exber, Inc.*, 92 Nev. at 729, 558 P.2d at 522 (MOWBRAY, J.) (citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557-58 (1964)). The district court erred by failing to resolve the doubts in favor of arbitrability. Accordingly, the district court's order staying arbitration is hereby reversed and this case is remanded with instructions that the district court grant CCPEA's application for an order compelling arbitration.

YOUNG, C. J., SPRINGER and MOWBRAY, JJ., concur.

STEFFEN, J., dissenting:
With due respect to my colleagues in the majority, I find no

basis whatsoever for concluding that the UMC policy concerning the clinical ladder program was incorporated in or to be affected by, any aspect of the parties' collective bargaining agreement. I therefore dissent from the majority's ruling.

Although I have no quarrel with the legal authorities cited by the majority, I fail to see how they apply to the instant case. As I see it, the primary flaw in the majority's position does not necessarily stem from their diffident, recurrent conclusion that "we cannot say with *positive assurance*" that the clinical ladder program or aspects thereof together with other unnamed UMC personnel policies were excluded from the ambit of the collective bargaining agreement. Rather, the major problem derives from the majority's root premise that whatever personnel policies were in being prior to the collective bargaining agreement, and continued thereafter, were included within the purview of the agreement whether specifically identified therein or not. Thus, the majority proclaim that "UMC very possibly had many personnel policies which it continued after signing this [collective bargaining] agreement, even though the policies were not specifically enumerated in the agreement. We cannot say with positive assurance that the clinical ladder program was not such a policy." (Majority opn., p. 7.) There are at least three obvious flaws in the quoted conclusion. First, we can say "with positive assurance" that the clinical ladder program was continued after the signing of the collective bargaining agreement despite the fact that it was not enumerated therein. Second, the only inference to be drawn from the majority's conclusion is that all UMC personnel policies commencing before and continuing beyond the date of the collective bargaining agreement were within its ambit whether enumerated therein or not. Third, the effect of the majority's premise is to render meaningless Article 5 of the collective bargaining agreement which clearly purports to reserve, "without negotiation" the sole right and authority in UMC to, inter alia "[p]romulgate, revise and modify rules, regulations and *personnel policies.*" (Emphasis supplied.)

UMC's clinical ladder program was indisputably a personnel policy which it established and promulgated. It was never made the subject of collective bargaining and was never included by name or otherwise within the collective bargaining agreement. Moreover, I believe it can be concluded "with positive assurance" that the program could never properly be considered to be the subject of a grievance within the purview of the collective bargaining agreement.

Article 10 of the agreement defines "grievance" to mean "a dispute between an employee(s) and/or the Association and UMC

over the interpretation or application of the express terms of this Agreement." The rights and entitlements of UMC's nurses under the clinical ladder program may not be properly resolved by looking to the interpretation and application of any express terms of the collective bargaining agreement. The agreement does not include, comprehend, or otherwise address the program, expressly or by an extension of its "spirit." It was established and promulgated as UMC personnel policy number IV-421, for which UMC retained sole right and authority to operate, revise and modify. Moreover, I would also state "with positive assurance" that the language of Article 5 (2) which states that "[a]ll rights and responsibilities of UMC *not specifically modified by this agreement shall remain the functions of UMC,*" means that all such rights and responsibilities shall remain in the exclusive province of UMC rather than the province of the agreement. To conclude otherwise effectively emasculates the paragraph.

I should pause here to note that the majority appears to confuse the rights of the complaining nurses to their entitlements under the clinical ladder program with their rights under the collective bargaining agreement. In my opinion, the two are mutually exclusive. Because the clinical ladder program was an aspect of UMC personnel policy outside the ·purview of the collective bargaining agreement, any rights denied the nurses by UMC under that program would be subject to remedies dehors the agreement. To conclude that the clinical ladder program is not subject to the collective bargaining agreement is not tantamount to concluding that the nurses are left without a remedy if their rightful entitlements under the program have been illegally denied them by UMC.

Finally, the majority concludes that "arguably" paragraphs one and four of Article 28 pertaining to training and education support CCPEA's contention that the clinical ladder program and the individual contracts emanating therefrom are incorporated within the collective bargaining agreement. I suggest that the argument, which attributes a substantial measure of ineptitude to the drafters of the agreement, is disingenuous. Article 28 generically commits UMC to provide education and training programs and policies, including in-service programs, that will encourage and assist employees in increasing and expanding their skills and knowledge. There is no provision within the article that specifies or implies a responsibility on the part of UMC to establish or maintain any particular program or method for accomplishing such training and education. As a result, any bona fide issue arising from paragraphs one and four of Article 28 would be limited to whether or not UMC was providing such training and education. In the instant case, all issues pertain to the clinical

ladder program and whether it is incorporated within the provisions of the collective bargaining agreement. Moreover, paragraph seven of Article 28 has no relationship to the clinical ladder program because it was strictly voluntary, and the latter paragraph applies only to educational programs where attendance is required by UMC.

The majority pays little attention and no heed to the detailed expression of the parties set forth under Article 36 entitled "Entire Agreement." Although the entire article has substantial relevance to this appeal and its proper disposition, I quote only the last two sentences of the article which read as follows: "All rights and duties of both parties are specifically expressed in this Agreement and such expression *is all-inclusive.* Any benefit existing prior to this Agreement is negated unless specifically incorporated into this Agreement." (Emphasis added.) It seems unnecessary to comment on the natural meaning of the phrases "specifically expressed in this Agreement" and "such expression is all-inclusive." Nevertheless, despite the clarity of language and its obvious intendment, the majority has incorporated therein subject categories either excluded from or not specifically expressed in the agreement, thus drastically expanding its ambit beyond the intention of the parties.

I submit that the real thrust of the majority opinion amounts to an irrelevant, misguided, ultra-jurisdictional policy decision superimposing on the parties' collective bargaining agreement an expansive, non-specific and philosophical nature. Thus, the majority concludes that "[r]equiring these nurses to pursue individual contract actions in court against UMC, instead of arbitration, hardly seems conducive to good labor-management relations or the efficient disposition of controversies." Obviously, the logical extension of the majority's reasoning eliminates the prospect of any activity or relationship between UMC and its employees that will not be subject to arbitration under the agreement. Moreover, it would seem that no Association or UMC policy or activity that may be of concern to the other, will be immune from the reach of the agreement irrespective of its language.

I suggest that the majority has resorted to such verbalistic havens as: (1) lack of positive assurance; (2) arguable possibilities; and (3) policies not conducive to healthy labor-management relationships and the efficient resolution of disputes, to justify re-writing the dimensions of the parties' agreement. Having manufactured uncertainty, they then invoke the presumption that the law requires arbitration whenever doubt exists as to its application. The package thus assembled by the majority obscures the fact that these parties obviously never intended to include the

clinical ladder program within the scope of their collective bargaining agreement. Indeed, it is not there!

Because I am fearful that the majority's reconstructive surgery on the collective bargaining agreement will produce more mischief than good, and is, I suggest, an improper exercise of this court's jurisdiction, I am compelled to dissent.