# 2002 DTA 100

**TRIBUNAL DE CIRCUITO DE APELACIONES
CIRCUITO REGIONAL I DE SAN JUAN, PANEL IV**

CONSTRUCTORA GEN, S.E.
Apelada

v.

AUTORIDAD DE EDIFICIOS PUBLICOS
Apelante

Núm. KLAN-2002-00224

San Juan, Puerto Rico, a 28 de mayo de 2002

Panel integrado por su Presidente, el Juez Gierbolini,
y los Jueces Cordero y Rodríguez Muñiz

Rodríguez Muñiz, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Autoridad de Edificios Públicos, (en adelante, la Autoridad), presentó recurso de apelación el 11 de marzo de 2002. Solicitó la revisión de la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, el TPI), el 21 de noviembre de 2001 y archivada en los autos el 8 de febrero de 2002.

A continuación exponemos brevemente el trasfondo fáctico y procesal del caso.

### I

El 29 de agosto de 1994, la Autoridad y Constructora Gen S.E. (en adelante, GEN), suscribieron un contrato mediante el cual esta última se obligaba a la construcción de una escuela vocacional en el Municipio de Arecibo. **Sentencia**, a la página 3 del apéndice de la apelación.

Dicho contrato, en su artículo 15.2, establece un procedimiento para dilucidar, a través de un procedimiento de arbitraje, aquellas disputas entre el contratista y la Autoridad que involucrasen un cambio en el precio del contrato. *Id.* La mencionada cláusula lee del siguiente modo:

*"15.2 Arbitration*

*15.2.1 In case of any dispute involving a change in contract price, the party not satisfied with the Architect or Engineer's written decision may request arbitration by filing a demand in writing with the Architect or Engineer within thirty (30) calendar days from the day of the decision."*

El 26 de octubre de 2000, GEN presentó una demanda para compeler a la Autoridad a dilucidar ciertas reclamaciones en su contra a través de un procedimiento de arbitraje. En ésta alegó que durante la ejecución de la obra, se emitieron nueve (9) órdenes de cambio que extendieron el tiempo fijado en el contrato para la terminación de la construcción, en aproximadamente 504 días adicionales. **Véase** a la página 13 del apéndice de la apelación.

Alegó, también, que el tiempo para que la obra fuera construida se dilató irrazonablemente por causas que no

le eran atribuibles. Indicó que la Autoridad no le compensó por los costos extendidos, que resultaron de la solución de los problemas que afectaron la obra y del retraso en la emisión de las correspondientes órdenes de cambio. Conforme a esos reclamos y otros que surgen de la demanda, requirió a la Autoridad que los mismos fueran sometidos al proceso de arbitraje dispuesto en el contrato de construcción. *Id.* a la página 2.

El 12 de enero de 2001, la Autoridad contestó la demanda. Mediante su contestación, negó la mayoría de las alegaciones y levantó, entre otras defensas afirmativas, que GEN había incumplido con el procedimiento dispuesto en el contrato de construcción para solicitar el arbitraje y que las controversias presentadas no eran arbitrables de acuerdo al contrato. *Id.* a las páginas 21-24.

Posteriormente, el 1ro de febrero de 2001, la Autoridad presentó una moción en la que solicitó del TPI que dictara sentencia sumaria. En ésta principalmente sostuvo que GEN estaba impedida de reclamar arbitraje, debido a que incumplió con las condiciones contractuales relativas a la solicitud de tal método de solución de disputas, según se requería en el contrato. Argumentó también, que el TPI carecía de jurisdicción para acoger la demanda, pues el demandado incumplió con lo dispuesto en la Ley de Arbitraje, que requiere que el demandante anuncie con ocho (8) días de anticipación al demandante la intención de presentar la demanda.

El 16 de mayo de 2001, GEN presentó su escrito de oposición. Manifestó que, contrario a la posición de la Autoridad, su solicitud de arbitraje fue presentada conforme a los términos del contrato y, además, cumplió con las disposiciones de la Ley de Arbitraje al presentar la demanda.

El 23 de mayo de 2001, el TPI celebró una vista para la argumentación de la moción de sentencia sumaria solicitada. Una vez celebrada la misma, con el beneficio de los escritos de las partes, el 21 de noviembre de 2001, dictó sentencia. En dicha sentencia, el TPI realizó las determinaciones de hechos que se resumen a continuación:

*"5. En parte alguna del contrato de construcción se limita el término del contratista para presentar reclamación que conlleve aumento en el precio contractual.*

*6. Desde el 19 de septiembre de 1994, apenas veinte (20) días de haberse comenzado con la ejecución de los trabajos, el contratista denunció situaciones que mantenían paralizado el proyecto.*

*7. Los trabajos de construcción comenzaron el 12 de septiembre de 1994, habiendo sido aceptados como sustancialmente terminados el 15 de febrero de 1997.*

*8. Durante la ejecución de los trabajos se emitieron varias órdenes de cambio que aumentaron el término contractual en 504 días llevando la fecha de terminación pactada hasta el 15 de febrero de 1997.*

*9. El tiempo y el dinero dispuesto en las órdenes de cambio representan el acuerdo entre las partes en cuanto al costo de realizar los trabajos comprendidos en las órdenes de cambio y el tiempo establecido para ejecutar los mismos.*

*10. Según consta de minuta de reunión semanal del proyecto, el 16 de marzo de 1995, la supervisión reconoce reclamación existente del contratista en torno a las obras a realizarse en el pasillo que conecta a la Escuela de Bellas Artes, ya existente, con la escuela de construcción.*

*11. El 6 de febrero de 1995, mediante carta dirigida por el contratista a la Autoridad de Edificios Públicos, se advierte de distintos problemas que afectan la obra y del efecto que la no solución de estos problemas acarrea en los costos y el desarrollo del proyecto. Dentro de estos costos adicionales se encuentra el aumento de salario mínimo federal.*

*12. El 13 de septiembre de 1995, el contratista somete reclamación para que se decida finalmente el asunto concerniente al pasillo entre las escuelas. A este momento no se ha tenido contestación por escrito de parte de la Autoridad de Edificios Públicos en torno a dicho problema.*

*13. Mediante carta del 23 de agosto de 1999, la Autoridad de Edificios Públicos contesta por escrito el reclamo realizado por el contratista el 13 de septiembre de 1995, denegando el mismo e indicando que era responsabilidad del contratista, previo a la subasta, cualquier omisión en el plano estructural del proyecto.*

*14. El 6 de septiembre de 1999, mediante carta dirigida por el contratista al Director Ejecutivo de la Autoridad de Edificios Públicos, se solicita revisión de la determinación alcanzada el 23 de agosto de 1999 y solicita reunión, de forma que pueda evitarse entrar en el procedimiento de arbitraje.*

*15. El 21 de septiembre de 1999, al no recibir contestación de la Autoridad de Edificios Públicos en cuanto a reconsideración de su carta del 23 de agosto, el contratista formalmente solicita arbitraje y específicamente reclama diferentes partidas que aumentarían el precio contractual.*

*El contratista en esta carta hace especial referencia a que de no actuarse en quince (15) días por parte de la Autoridad de Edificios Públicos, procederá con cualquier derecho o acción que en derecho tengan a su alcance.*

*16. El 12 de junio de 2000, mediante carta dirigida por el Lcdo. José L. Cabiya Morales, representante legal del Contratista, se peticiona nuevamente el arbitraje de las reclamaciones de extensión en el precio contractual relativos al (sic) a dilación de 504 días en la terminación de la obras.*

*17. Conforme al récord, las cartas del 6 y 23 de septiembre de 1999, así como la del 12 de junio de 2000, no fueron contestadas por la Autoridad de Edificios Públicos.*

*18. El 26 de octubre de 2000, se presenta por el contratista demanda para compeler arbitraje.*

*19. El proyecto de construcción en finalmente aceptado por la Autoridad de Edificios Públicos el 22 de enero de 2001."*

Conforme a esas determinaciones de hechos, el TPI resolvió que GEN había preservado adecuadamente su derecho contractual a resolver sus controversias con el dueño mediante arbitraje. Concluyó también, que GEN igualmente preservó su derecho a reclamar por razón del incremento de sus costos, al extenderse irrazonablemente la terminación de la obra. El TPI destacó que la Autoridad *"debió haber estado consciente de los reclamos por costos extendidos de construcción del contratista, los cuales, sin embargo, no fueron contemplados en las órdenes de cambio emitidas."* **Sentencia**, a la página 8 del apéndice de la apelación.

De otra parte, el TPI resolvió que la Autoridad no tenía razón en su argumento, en el sentido de que GEN estaba impedido de solicitar del TPI una orden para obligar al arbitraje porque incumplió con la notificación de ocho (8) días que señala la Ley de Arbitraje. *Id.* a la página 9. Intimó el TPI que GEN, mediante la carta de 21 de septiembre de 1999, en la que solicitó arbitraje, advirtió también que tenía intención de recurrir a cualquier remedio que en derecho le correspondiese, en caso de ser desatendida su petición en un término de quince (15) días. Según concluyó el TPI, esa advertencia razonablemente incluia el remedio de recurrir al Tribunal a solicitar que se emitiese una orden para obligar al arbitraje. *Id.*

Como fundamento alternativo, el TPI indicó que la falta de hacer la notificación en el término de ocho (8) días es una defensa afirmativa que debe ser levantada en la contestación a la demanda. Razonó el TPI, que en el caso ante nos, la Autoridad no levantó dicha defensa en su contestación, por lo que se sometió voluntariamente a su jurisdicción. *Id.*

Basado en los anteriores fundamentos, el TPI declaró no ha lugar la solicitud para dictar sentencia sumaria sometida por la Autoridad y ordenó a las partes que sometieran a arbitraje las controversias planteadas por GEN. Les ordenó también, que conforme al contrato de construcción, nombrasen su respectivo árbitro, así como un tercer árbitro de consenso.

Inconforme con la determinación del TPI, la Autoridad acude ante nos y señala los siguientes errores:

*"1. ERRO EL TRIBUNAL DE INSTANCIA AL RESOLVER QUE LA RECLAMACION DE GEN ES ARBITRABLE, A PESAR DE ESTA HABER INCUMPLIDO CON EL PROCEDIMIENTO Y LOS TERMINOS DE NOTIFICACION PARA PRESENTAR SU RECLAMACION Y SOLICITUD DE ARBITRAJE, CONFORME A LAS CONDICIONES GENERALES QUE SE OBLIGO A CUMPLIR EN SU CONTRATO CON LA AUTORIDAD.*
*2. ERRO EL TRIBUNAL DE INSTANCIA AL RESOLVER QUE GEN PRESERVO ADECUADAMENTE SU DERECHO CONTRACTUAL A RESOLVER SUS CONTROVERSIAS MEDIANTE ARBITRAJE PORQUE EL CONTRATO NO ESTABLECE UN TERMINO PARA SOMETER LAS RECLAMACIONES SOBRE AUMENTO EN EL COSTO DEL CONTRATO.*

*3. ERRO EL TRIBUNAL DE INSTANCIA AL RESOLVER QUE LAS CARTAS DEL CONTRATISTA SEÑALANDO LAS SITUACIONES QUE ESTABAN OCURRIENDO Y QUE FUERON LUEGO OBJETO DE ORDENES DE CAMBIOS CONSTITUIAN UN RECLAMO DE COSTOS EXTENDIDOS, POR PARTE DE ESTE.*

*4. ERRO EL TRIBUNAL DE INSTANCIA AL RESOLVER QUE EL INCUMPLIMIENTO DE NOTIFICAR, CONFORME LO DISPONE LA LEY DE ARBITRAJE, NO PUEDE LEVANTARSE, COMO SE HIZO EN ESTE CASO, Y QUE LA ALEGACION QUE SE HIZO EN LA CONTESTACION A LA DEMANDA SOBRE FALTA DE JURISDICCION DEL TRIBUNAL NO CUMPLE CON EL REQUISITO DE LEY Y QUE DICHA DEFENSA FUE RENUNCIADA."*

Por las razones que se exponen a continuación, se modifica la sentencia apelada.

## II

El Artículo 1ro de la Ley de Arbitraje Comercial dispone que: *"dos o más partes podrán convenir por escrito el someter a arbitraje . . . cualquier controversia que pudiera ser objeto de una acción existente entre ellos a la fecha de dicho convenio . . .; o podrán incluir en un convenio por escrito una disposición para el arreglo mediante arbitraje de cualquier controversia que en el futuro surgiere entre ellos de dicho acuerdo o en relación con el mismo. Tal convenio será válido, exigible e irrevocable, salvo por los fundamentos que existieren en derecho para la revocación de cualquier convenio."*

32 L.P.R.A. sec. 3201

Añade el artículo 4 de la citada ley que: *"[c]ualquiera de las partes de un convenio por escrito de arbitraje que alegare la negligencia o negativa de otra a proceder a un arbitraje de conformidad con el convenio podrá solicitar del tribunal una orden obligando a las partes a proceder a arbitraje de conformidad con el convenio entre ellas."*

El Tribunal Supremo de Puerto Rico reiteradamente ha expresado que en Puerto Rico existe una fuerte política pública que favorece el arbitraje de controversias. *Crufon Construction Corp. v. Autoridad de Edificios Públicos,* **2002 J.T.S. 24**, 726, Opinión de 11 de febrero de 2002; *Bird Const. Corp. v. A.E.E.,* **2000 J.T.S. 202**, 597, Opinión de 26 de diciembre de 2000. No obstante, dicho foro ha señalado que este *"mecanismo se utilizará*

*sólo si las partes así lo han pactado y en la forma en que lo han pactado."* Crufon, *supra,* a la página 726.

También ha sido enfatizado que *"[l]a 'arbitrabilidad' de una controversia, es decir, la determinación de si un acuerdo crea el deber de las partes de arbitrar una controversia en particular es tarea judicial."* World Films, Inc. v. Paramount Pictures Corp., 125 D.P.R 352, 361 (1990). En ese sentido, para determinar si un contrato crea la obligación de arbitrar, es función de los tribunales *"auscultar la intención de las partes para determinar cuáles son las controversias que pactaron arbitrar, toda vez que '[siendo el arbitraje] un asunto contractual, no se puede obligar a una parte a someter a arbitraje una disputa que dicha parte no ha acordado someter.'"* Crufon, *supra,.* a la página 727; *Municipio de Ponce v. Gobernador,* 136 D.P.R 776, 783, n. 1 (1994).

Siendo tarea judicial la determinación de si determinado convenio crea la obligación de arbitrar, debemos resolver entonces si las reclamaciones presentadas por GEN son arbitrables de acuerdo al contrato de construcción entre las partes en este caso.

De acuerdo al contrato suscrito entre la Autoridad y GEN, el arbitraje podrá ser solicitado en caso de cualquier disputa que involucre un cambio en el precio del contrato. ■ Aunque dicha frase puede evocar múltiples situaciones o asuntos que pudiesen tener un efecto en el precio o costo de completar una obra, el Tribunal Supremo, en el caso de *Crufon, supra,* determinó que la misma se refiere únicamente, a aquellas controversias que surgieran a consecuencia de una orden de cambio emitida por el dueño de la obra. *Id.* a la página 728. ■

Resolvió el Tribunal Supremo que *"no toda disputa entre el contratista y el dueño de la obra relacionada al precio del contrato era arbitrable independientemente de la razón o circunstancia que provocara la reclamación."* Id.

Con relación al significado de la frase **aumento en el precio del contrato,** de acuerdo a la sección 15.2.1 del contrato de construcción, la opinión del Tribunal Supremo explicó, que:

*"[e]l aumento en precio es el que resulta **de una orden de cambio** o de una exigencia adicional que produce, a su vez, un aumento en los jornales o materiales. Las "adiciones" y "deducciones" a las que podía estar sujeto el precio del contrato sólo podían ser provocadas por un cambio o aumento en el trabajo pactado, a consecuencia de una orden de cambio emitida por el dueño de la obra."*

*Id.* (énfasis suplido).

En definitiva, si las reclamaciones sobre aumento en el precio del contrato están basadas en circunstancias ajenas a cualquier orden de cambio emitida por el dueño, las mismas no son arbitrables. *Id.*

En atención a los pronunciamientos del Tribunal Supremo antes expuestos, analicemos si las reclamaciones sometidas por GEN son arbitrables.

Mediante la carta de 21 de septiembre de 1999, GEN, por primera vez, exige a la Autoridad que someta sus diferencias a un proceso de arbitraje. **Véase** a la página 98 del apéndice de la apelación. En esta comunicación, GEN reclamó compensación a la Autoridad por unas partidas que identificó como costos extendidos ascendentes a $231,200.00, costos directos extendidos de campo $157,680.00, aumento en el salario mínimo $127,000.00, pérdida de eficiencia en la mano de obra, costo de órdenes de cambio ejecutadas y no pagadas $25,573.00. *Id.*

Posteriormente, el 12 de junio de 2000, GEN envió otra carta a la Autoridad en la que menciona que como consecuencia de ciertas circunstancias que se presentaron durante la realización de la obra, se emitieron órdenes de cambios que extendieron el término de ejecución de la construcción en 536 días y el costo de la obra en $548,149.66. *Id.* a la página 147. En esta carta, GEN narró también que el progreso de los trabajos se vio afectado

por otros factores como:

*"1. Dilación del dueño en gestionar y proveer permiso de construcción. Esta situación afectó en forma general los trabajos llevandose (sic) a cabo en el proyecto.*

*2. Dilación en la confección de planos necesarios para la construcción de la sub-estación que habría de suplir energía eléctrica al proyecto. Al no poderse construir en tiempo la sub estación eléctrica, se retrasó la terminación de los trabajos generales de la obra.*

*3. Dilación de confección de enmienda a planos para relocalizar los edificios A y B. La espera por esta enmienda a los planos retrasó también el rediseño del sistema de desagüe pluvial y el sistema de asperjadores de agua ("sprinkles"), entre otros.*

*4. Dilación en la aprobación de orden de cambio necesaria para viabilizar el depósito de relleno adicional y compactación del mismo para brindar contornos adecuados al terreno y subsanar deficiencia en estudio topográfico. Las actividades de depósito de relleno se retrasaron indebidamente pendiente de la autorización por la AEP.*

. . . .

*6. Dilación en aprobación de orden de cambio para disponer de montículos de terreno depositados por contratista de escuela aledaña.*

*7. Dilación en revisión de diseño de planos mecánicos lo cual retrasó la conexión de tubería de agua potable y sanitaria al proyecto.*

*8. Dilación en la confección de planos eléctricos enmendados para especificar la forma en que habría de instalarse extractores de aire y calentadores de agua."*

*Id.* a las páginas 148-149.

Además de dicho listado, la carta expresó que la Autoridad debió emitir una orden de cambio relacionada a la construcción de un pasillo, y que luego de edificado el mismo, la Autoridad se ha negado a su pedido. *Id.* a la página 149.

De otra parte, en la demanda sometida en el caso de autos, GEN reiteró los reclamos que había realizado en las cartas que han sido reseñadas. Además, especificó que durante la ejecución de la obra, se emitieron nueve (9) órdenes de cambio que tuvieron el efecto de incrementar el término de ejecución del proyecto en 504 días. Añadió también, que en estos momentos existe un balance pendiente de liquidación.

De acuerdo a las guías pautadas por el Tribunal Supremo en el caso de *Crufon, supra*, las *"adiciones"* y *"deducciones"* a las que podía estar sujeto el precio del contrato sólo pueden ser provocadas por un cambio o aumento en el trabajo pactado, a consecuencia de una orden de cambio **emitida** por el dueño de la obra. De ese modo, solamente las reclamaciones instadas por GEN, que surgieran a consecuencia de una orden de cambio emitida, están sujetas al procedimiento de arbitraje. En ese sentido, las siguientes reclamaciones de GEN, según surgen de los documentos examinados, no pueden ser objeto de arbitraje:

*"1. El aumento en el salario mínimo federal.*

*2. Los puntos 1, 2, 3, 4, 6, 7 y 8 de la carta de 12 de junio de 2000.*

*3. La controversia con respecto a si debió emitirse una orden de cambio para la edificación del pasillo que conecta la escuela vocacional de Arecibo con una adyacente de Bellas Artes."*

A tenor con lo anterior, al ser remitido el caso al procedimiento de arbitraje, el panel de árbitros sólo podrá considerar las controversias que surjan de las órdenes de cambios que fueron emitidas.

## III

En cuanto a los errores alegados por la Autoridad en su escrito de apelación, los primeros tres van dirigidos a cuestionar la arbitrabilidad procesal de las reclamaciones sometidas por GEN.

La arbitrabilidad procesal se refiere a la determinación de si la parte que invoca el derecho a arbitrar, ha cumplido con los requisitos procesales que impone el acuerdo para poder solicitar el remedio. 4 *Am Jur 2d* § 165 (1995).

En los Estados Unidos, la mayor parte de la doctrina en el campo del arbitraje está de acuerdo en que la arbitrabilidad procesal de un caso es un asunto que debe ser resuelto por el árbitro en primera instancia. *"An arbitrator has the authority to determine procedural as well as substantive matters. The arbitrator, not the court, is the appropriate body to determine whether procedural requisites which condition the duty to arbitrate have been met ...."*. 4 *Am Jur 2d* § 165. **Véase, además**, Demetrio Fernández Quiñones, *El Arbitraje Obrero-Patronal* § 7.11 (2000).

La norma enunciada en el acápite anterior fue establecida en el caso de *John Wiley & Sons v. Livingston*, 376 U.S. 543, 557 (1964). Aquí, el Tribunal Supremo de los Estados Unidos expresó lo siguiente: *"Once it is determined, as we have, that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." Id.* Esta norma tiene su origen en el ámbito del arbitraje obrero-patronal. No obstante, la misma ha sido adoptada para aquellos casos que involucran disputas en el área del arbitraje comercial. Esto ha sido así, puesto que algunos tribunales han reconocido que muchos de los principios sobre arbitraje que han emergido del contexto obrero-patronal son igualmente aplicables al arbitraje comercial. *Painewebber Incorporated v. Elahi*, 87 F.3d 589, n. 6 (8vo Cir. 1996) (reconociendo que el Tribunal Supremo de los Estados Unidos aplicó principios del arbitraje laboral en un caso de arbitraje comercial); *Stroh Container Company v. Delphi Industries, Inc.*, 783 F.2d 743, n.9 (1er Cir. 1986) (*"The Wiley rule arose from ... arbitrations involving disputes under collective bargaining agreements. We find its rationale equally applicable in the commercial arbitration setting."*).

Un autor ha identificado que en Puerto Rico el Tribunal Supremo ha seguido una idéntica postura; es decir, fundir los principios del arbitraje comercial con los del arbitraje laboral. Según observa el Profesor Helfeld, *"[p]or la manera en la cual el Tribunal Supremo cita casos de índole obrero-patronal en los casos de arbitraje comercial, es palpable que se han fundido los principios rectores en un sólo cuerpo de normas aplicables a arbitraje sin distinguir entre lo laboral y lo comercial."* David M. Helfeld, *La Jurisprudencia Creadora: Factor Determinante en el Desarrollo del Derecho de Arbitraje en Puerto Rico*, 70 *Rev. Jur. U.P.R.* 57-58 (2001).

Permitir que el árbitro sea el primero en decidir los asuntos con respecto a la arbitrabilidad procesal de una controversia, se reconoce como una regla de deferencia. Esta deferencia tiene los siguientes fundamentos: *"(1) procedural questions are often intertwined with the merits of the dispute, and (2) the reservation of procedural issues for the courts provides an opportunity for serious delay and duplication of effort." Wiley, supra*, a las páginas 556-58, n. 9; *Stroh Container, supra*, a las páginas 748-749. **Véase en general** Helfeld, *supra*, a la página 97, n. 372.

En particular, la situación con respecto a si corresponde a los tribunales o al árbitro la autoridad para

determinar si un caso es arbitrable procesalmente, es un asunto que no ha sido atendido expresamente por el Tribunal Supremo de Puerto Rico.

Sin embargo, sí ha manifestado, con respecto a los poderes de los árbitros en cuanto a las controversias que tiene ante sí, que *"[l]a naturaleza y extensión de los poderes del árbitro están delimitados por el lenguaje y la intención del acuerdo de arbitraje."* *World Films*, 125 D.P.R. 352, 362. De acuerdo a la jurisprudencia, como regla general, *"cuando la cláusula de arbitraje es lo suficientemente amplia, el árbitro tiene la autoridad para adjudicar prácticamente todo tipo de controversia legal."* *Id.*

A tenor con los fundamentos de derecho anteriormente expuestos, una vez hemos decidido que varias de las reclamaciones de GEN son arbitrables sustantivamente, corresponde enviar el caso a arbitraje, para que el panel de árbitros determine en primera instancia si, de acuerdo al contrato, GEN preservó su derecho a solicitar el remedio de arbitraje. En atención a lo anterior, los errores identificados con los números 1, 2 y 3 no serán discutidos.

## IV

Como cuarto error, la Autoridad argumenta que GEN incumplió con lo dispuesto en el Art. 4(1) de la Ley de Arbitraje. Dicho artículo de la ley establece lo siguiente: *"Ocho (8) días de aviso de dicha solicitud por anticipado, se dará por escrito a la parte que se alegue no estar cumpliendo con el convenio."* 32 L.P.R.A. sec. 3204(1).

En el caso de autos, el TPI determinó que GEN, mediante la carta enviada el 21 de septiembre de 1999, cumplió con el requisito mencionado en el artículo cuatro (4). En esta carta, GEN solicitó el arbitraje y advirtió que en caso de ser desatendida su petición en un término de quince (15) días, recurriría a cualquier remedio que en derecho le correspondiese. Según expresó el TPI, dicha advertencia razonablemente incluía el remedio de acudir al tribunal a solicitar una orden para obligar a arbitrar. Por lo que tal advertencia sería suficiente para cumplir con el aviso que se alude en la Ley de Arbitraje.

Por su parte, la Autoridad sostiene que dicha carta no cumple con el término ni la forma que estableció el legislador en la Ley de Arbitraje. No obstante, aunque dicha ley señala un término mínimo de ocho (8) días, la misma no establece la manera de hacer el aviso, ni evidencia en modo alguno que el requisito sea jurisdiccional.

Coincidimos con la posición asumida por el TPI. Entendemos que la carta de 21 de septiembre de 1999, cumple con el requisito de dar aviso a la otra parte según exige la Ley de Arbitraje, por lo que el error señalado no fue cometido.

## V

Por las razones antes expuestas, se modifica la sentencia apelada y se le ordena a las partes proceder al arbitraje de conformidad con los términos establecidos en esta sentencia.

Lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 2002 DTA 100**

1. *"In case of any dispute involving a change in contract price . . . ."* *General Conditions of the Contract for the Construction of Public Works*, Sección 15.2.1, a la página 47 del apéndice de la apelación.

2. El caso de *Crufon*, involucraba como partes a la Autoridad de Edificios Públicos y al contratista Crufon Construction,

Corp. Asimismo, el contrato bajo estudio en ese caso era el mismo que está ante nuestra consideración, siendo las controversias planteadas similares a las del caso de autos.